UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

GUSTAVO KINRYS,

Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Criminal No.   20cr10307

Violations:

Counts One - Seven:  Wire Fraud
(18 U.S.C. § 1347)

Counts Eight –Thirteen:  False Statements
Relating to Health Care Matters
(18 U.S.C. § 1035)

Count Fourteen:  Destruction, Alteration, or
Falsification of Records in Federal
Investigations
(18 U.S.C. § 1519)

Count Fifteen:  Obstruction of a Criminal
Investigation of a Health Care Offense
(18 U.S.C. § 1518)

Forfeiture Allegation:
(18 U.S.C. § 982(a)(7))

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.　　 The defendant, GUSTAVO KINRYS ("KINRYS"), was a licensed psychiatrist who resided in Wellesley, Massachusetts.

2.　　 Psychiatrists are medical doctors who specialize in the diagnosis and treatment of mental disorders.

1

3.     Advanced TMS Associates, also known as Boston Center for Clinical Research ("BCCR"), was a medical practice located at 67 Union Street, Natick, Massachusetts that KINRYS owned and operated.

Overview of the Fraud Scheme

4.     Between in or about January 2015 and December 2018, KINRYS caused Medicare and private insurance companies to pay him for thousands of medical treatments that he never rendered.  Specifically, KINRYS billed insurers for thousands of transcranial magnetic stimulation ("TMS") therapy sessions that he never provided to his patients, including 460 sessions he supposedly provided to his wife, who never received any TMS therapy.   In total, KINRYS billed insurers over $10.6 million for TMS sessions he never provided, including 8,484 sessions on 75 patients who did not receive a single session of TMS therapy.   KINRYS also billed Medicare and private insurers over $345,000 for hundreds of psychotherapy sessions he did not provide, including 1,175 face-to-face sessions he falsely claimed he provided to patients while he or his patients were, in fact, out of the country.  To further his scheme, KINRYS made numerous false statements to his patients, the billing company with which he worked, and the public and private insurers to whom he submitted claims seeking money in the form of reimbursement.  When Medicare, private insurers, and the Office of Health and Human Services ("HHS") became suspicious of KINRYS's billing practices, he took steps to conceal his crimes by making false representations and creating false documentation purporting to show that he had provided the thousands of treatments he billed for, but never rendered.

### The Medicare Program

5.      Medicare was a federally-funded health care program that provided benefits to individuals who are sixty-five years of age or older, or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b).  Individuals who qualify for Medicare benefits were commonly referred to as Medicare "beneficiaries."  Medicare was subdivided into multiple Parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies.  Medicare Part B covered physician services and outpatient care, including services provided by psychiatrists, like KINRYS.

### Commercial Health Insurance Companies

6.      Commercial health insurance companies, also known as private insurers, provided compensation for medical bills that were the result of sickness or injury.  A person covered by a private health insurance plan, also known as a member, paid a monetary premium for health care benefits specified in an insurance policy agreement.  When a member made a claim, the private insurer provided compensation to the health care provider and, depending on the insurance policy agreement, the member would make a co-payment in connection with the goods or services the health care provider performed.

7.      Private insurers included the following:  Blue Cross Blue Shield ("BCBS"), Tufts, Aetna, Optum, and Beacon.  These private insurers offered and administered health care benefit programs within the meaning of 18 U.S.C. § 24(b).  These private insurers provided coverage for numerous patients who sought treatment from KINRYS.

Claims for Reimbursement for Patient Treatment

8.      To obtain payment or reimbursement for medical services, health care providers like KINRYS submitted bills or "claims" to Medicare or private insurers.  In those claims, health care providers described the type and level of medical services they provided to their patients. To do so, health care providers used five-digit codes taken from a manual of Physicians Current Procedural Terminology, known as "CPT codes."  CPT codes are published and maintained by the American Medical Association and its collection of physicians from every specialty, who determine appropriate definitions for each code.  By submitting claims using these CPT codes, health care providers represented to Medicare and private insurers that the services described in the codes were, in fact, performed and were medically necessary for the care and treatment of that patient.

9.      Medicare and private insurers also required that the claims that health care providers submitted contained additional important information, including:  (a) the beneficiary's or member's name and unique identifier; (b) a description of the health care benefit, item, or service provided to the beneficiary or member; (c) the date on which the benefit, item, or service was provided; and (d) the name of the health care provider and his or her unique identifying number (known either as a Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI")).  Health care providers could submit claims to Medicare or private insurers in hard copy or electronic form and could use intermediaries, such as a billing company, to submit those claims.

TMS Therapy and CPT Codes

10.     KINRYS provided TMS therapy to certain of his patients beginning in 2015.

11.     TMS is a noninvasive method of brain stimulation used to treat adults who have a confirmed diagnosis of major depressive disorder.  Neuronetics, Inc. manufactured and sold a medical device used to provide TMS therapy called the NeuroStar TMS Therapy System ("NeuroStar System").  The NeuroStar System was a computerized, electromechanical medical device that produced and delivered non-invasive, magnetic stimulation using brief duration, rapidly alternating, or pulsed, magnetic fields to induce electrical currents directed at spatially discrete regions of a patient's cerebral cortex.  The NeuroStar System provided an in-office treatment that the FDA cleared to be performed in as few as 19 minutes (but could take up to 39 minutes due to patient sensitivity or at the discretion of the treating psychiatrist) per session.  The TMS therapy treatment is performed while the patient is awake, alert and seated in the NeuroStar System's chair.  According to the manufacturer's literature, a course of TMS therapy treatment consists of sessions administered for five days per week for up to six weeks.

12.     In addition to selling the NeuroStar System, Neuronetics also sold bundles of treatment sessions.  The NeuroStar System was designed so that the number of TMS treatment sessions a user could provide to patients was limited by the number of TMS treatment sessions that user had purchased from Neuronetics.  For example, if a provider purchased 1,000 TMS treatment sessions from Neuronetics, that provider could only provide 1,000 TMS treatment session to his patients and, consequently, could only bill health insurers for 1,000 treatment sessions.  If a provider attempted to provide more TMS treatment sessions than he had purchased

from Neuronetics, the NeuroStar System would effectively shut down, and display an error code indicating that the provider was out of TMS treatment sessions.

13.     The American Medical Association created three CPT codes to bill TMS therapy to Medicare and private insurers:  CPT codes 90867, 90868, and 90869.  CPT code 90867 was the billing code for "therapeutic repetitive transcranial magnetic stimulation [TMS] treatment; initial, including cortical mapping, motor threshold determination, delivery and management." CPT code 90868 was the billing code for "subsequent delivery and management, per session." CPT code 90869 was the billing code for "subsequent motor threshold re-determination with delivery and management."

<u>KINRYS's Purchase and Use of Two NeuroStar Systems</u>

14.     In or about May 2015, KINRYS financed the purchase of a NeuroStar System for his office at 67 Union Street in Natick, Massachusetts.  KINRYS also purchased 100 TMS treatment sessions.

15.     KINRYS began providing TMS therapy to certain of his patients in June 2015 after purchasing this first of two NeuroStar Systems.

16.     In or about February 2018, KINRYS financed the purchase of a second NeuroStar System for his Natick office.  He also purchased an additional 300 TMS treatment sessions.

17.     In or about March 2018, KINRYS began providing TMS therapy to certain of his patients using the second NeuroStar system.

18.     Between June 1, 2015 and October 24, 2018, KINRYS purchased a total of 5,594 TMS treatment sessions from Neuronetics.  During that same timeframe, KINRYS or workers at

6

his office provided patients with a total of 5,587 TMS treatment sessions using the two

NeuroStar Systems at KINRYS' Natick office.

19.     Despite only providing 5,587 TMS treatments sessions, KINRYS fraudulently

submitted, or caused the submission of, claims to Medicare and private insurers seeking

reimbursement for over 26,200 TMS treatment sessions under CPT codes 90867, 90868, or

90869.

### Psychotherapy and Evaluation and Management (E/M) Services

20.     KINRYS purported to provide evaluation / management ("E/M") services and

psychotherapy to his patients at his Natick office beginning in at least January 2015.

21.     E/M services were also known as office visits. For established patients, a

psychiatrist could submit claims for E/M services or office visits using CPT code 99214, among

others. Private insurers and Medicare reimbursed health care providers at increasing rates based

on the level of complexity indicated by the E/M codes. Determining the proper CPT code

depended on the nature of the E/M service or office visit.

22.     CPT code 99214 was the appropriate code for an office visit for an established

patient, which required at least two of the following three key components: (1) a detailed

history; (2) a detailed examination; and/or (3) medical decision-making of moderate complexity.

Typically, the presenting problems are of moderate to high severity. Psychiatrists typically

spend 25 minutes face-to-face with the patient and/or family.

23.     Psychotherapy was the treatment of mental illness and behavioral disturbances in

which a health care provider, through definitive therapeutic communication, attempted to

alleviate emotional disturbances, change maladaptive patterns of behavior, and encourage personality growth and development.

24.     When a psychiatrist sought reimbursement from Medicare or a private insurer for psychotherapy he provided to an individual patient, he was required to use CPT codes 90832, 90833, 90834, 90836, 90837, or 90838.  For a psychiatrist to report psychotherapy under those CPT codes, the patient was required to be physically present for all, or at least a majority of the session.

25.     CPT code 90836 was the appropriate code to report a session of psychotherapy when it was an add-on session to an E/M service (CPT code 99214).  In a scenario where a psychiatrist reported an E/M service and psychotherapy session on a particular patient on the same day, the two services needed to be "significant and separately identifiable."  To report CPT code 90836 in that situation, the psychiatrist was required to have spent 45 minutes doing psychotherapy with the patient.

26.     KINRYS frequently billed a patient's insurer for an E/M service with add-on psychotherapy using CPT codes 99214 (E/M service) and 90836 (the add-on psychotherapy).  For a psychiatrist to submit a claim using those CPT codes, the psychiatrist would need to spend at least 60 minutes face-to-face with the patient.

KINRYS's Method for Billing for E/M and Psychotherapy Sessions and TMS Therapy

27.     KINRYS worked with a billing company ("Billing Company") to submit claims to Medicare and private insurers to get paid for E/M services, psychotherapy sessions, and TMS therapy he purportedly provided to his patients.  Most weeks, KINRYS would send an email with an attached billing sheet to Billing Company.  The billing sheet KINRYS created and sent

identified, among other things, the patient / beneficiary, the date of the E/M service, psychotherapy session, or TMS treatment KINRYS supposedly provided, and the CPT codes for those treatments. Pursuant to the contract KINRYS had with Billing Company, Billing Company would submit claims to Medicare and private insurance companies, based on the information KINRYS provided to the Billing Company. The contract specified that KINRYS represented and warranted that all information he provided to Billing Company "shall be true and correct." Under the terms of the contract, Billing Company had no authority to decide (and in fact did not decide) which codes were submitted to Medicare and private insurers; instead, Billing Company relied exclusively on the billing sheets that KINRYS provided to them.

28.     In response to Billing Company's submission of claims to Medicare and the private insurers, Medicare and those private insurers provided checks payable to KINRYS, which he deposited into an account he controlled, or made electronic funds transfers to a bank account that he controlled.

### Scheme to Defraud

29.     Between in or about January 2015 and December 2018, in the District of Massachusetts and elsewhere, the defendant GUSTAVO KINRYS, knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud and obtained money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and knowingly transmitted and caused to be transmitted, by means of wire communications, writings and signals in interstate and foreign commerce certain writings, signs,

9

signals, pictures and sounds, for the purpose of executing such scheme or artifice in violation of Title 18, United States Code, Section 1343.

### The Purpose of the Scheme to Defraud

30.     The purpose of the scheme to defraud was for KINRYS to unlawfully enrich himself and to defraud Medicare and private insurers of money to which KINRYS was not entitled by submitting, and causing the submission of, materially false and fraudulent claims for benefits and services that he did not provide.

### Means to Accomplish the Scheme to Defraud

31.     It was a part of the scheme to defraud that KINRYS created false and fraudulent billing sheets representing that he had provided services and benefits to patients that he, in truth, had not provided.

32.     It was a further part of the scheme to defraud that KINRYS maintained control of the false and fraudulent billing sheets, emailed those billing sheets to Billing Company, and directed Billing Company to create and submit materially false and fraudulent claims based on those billing sheets.

33.     It was a further part of the scheme to defraud that KINRYS created, and directed his office workers to create, false medical records to support claims for benefits and services he purported to, but did not, provide.

34.     It was a further part of the scheme to defraud that, after KINRYS created, and directed his office workers to create, false medical records and progress notes for benefits and services that he did not render, KINRYS provided that false and fraudulent documentation to

10

Medicare and private insurers in response to requests by those entities for medical records to support KINRYS's claims for reimbursement.

35.    It was a further part of the scheme to defraud that KINRYS caused the preparation and submission of claims to Medicare and private insurers using CPT codes 99214 and 90836 to describe E/M services and psychotherapy sessions he purportedly provided to patients when, in fact, KINRYS had neither seen the patient nor provided the E/M service or the psychotherapy session.

36.    It was a further part of the scheme to defraud that KINRYS caused the preparation and submission of claims to Medicare and private insurers using CPT codes 90867, 90868, and 90869 to describe TMS treatments that KINRYS and his office workers purportedly provided to patients using the NeuroStar System when, in fact, those patients did not receive TMS treatment and, in hundreds of instances, when those patients had not even been physically present at KINRYS's Natick office where the NeuroStar Systems were located.

37.    It was a further part of the scheme to defraud that KINRYS caused the preparation and submission of claims to Medicare and private insurers using CPT codes 99214 and 90836 to describe face-to-face E/M services and psychotherapy sessions he purportedly provided to certain patients when, in fact, KINRYS knew he had not provided those services because he was outside the United States on those dates.

38.    It was a further part of the scheme to defraud that KINRYS caused the preparation and submission of claims to Medicare and private insurers using CPT codes 99214 and 90836 to describe E/M services and psychotherapy sessions he purportedly provided to specific patients and CPT codes 90867, 90868, and 90869 to describe TMS therapy he purportedly provided to

specific patients when, in fact, KINRYS could not have provided those services because those patients were outside the United States.

39.     It was a further part of the scheme to defraud that, in hundreds of instances, KINRYS caused the preparation and submission of claims to Medicare and private insurers using CPT codes 99214 and 90836 to describe E/M services and psychotherapy sessions he purportedly provided to over 24 patients in a single day, when providing those services to that number of patients would have required KINRYS to work over 24 hours in a single day.

40.     It was a further part of the scheme to defraud that KINRYS misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purpose of those acts.

41.     As a result of the submission of false and fraudulent claims, KINRYS, caused Medicare and private insurers to pay him over $3.7 million to which he was not entitled.

<u>Examples of KINRYS's Execution of the Scheme to Defraud</u>

*KINRYS Billed Medicare and Private Insurers for TMS Treatments He Did Not Provide*

42.     KINRYS routinely submitted, or caused Billing Company to submit, claims for TMS therapy that he did not provide to hundreds of his patients, including, among others, the patients discussed below.

a.     Patient 1 was KINRYS's wife.  Between October 12, 2015 and December 1, 2017, KINRYS submitted, or caused the submission of, 460 claims to Patient 1's insurer, BCBS, for TMS therapy KINRYS supposedly provided.  KINRYS's claims reflected that he had provided TMS therapy to Patient 1 five days per week for months, including five days during the week of February 19-25, 2017, when Patient 1 was outside the United States.  In truth, Patient 1

did not receive a single TMS treatment. BCBS paid KINRYS $96,004 for TMS therapy sessions that KINRYS never provided and that Patient 1 never received.

        b.      Patient 2 became a patient of KINRYS's in 2015. Between February 6, 2017 and November 17, 2017, KINRYS submitted, or caused the submission of, 188 claims to Patient 2's insurers, Medicare and Beacon, for TMS therapy KINRYS supposedly provided to Patient 2. KINRYS's claims reflected that he provided TMS therapy to Patient 2 five days per week for months at a time. In truth, Patient 2 did not receive a single TMS therapy session at KINRYS's office. Medicare paid KINRYS $29,721 and Beacon paid KINRYS $4,817 for TMS therapy sessions that KINRYS never provided and that Patient 2 never received.

        c.      Patient 3 began seeing KINRYS for medication management in or around 2010. In 2015, KINRYS suggested that Patient 3 try TMS therapy. Between June 6, 2016 and December 30, 2016, KINRYS submitted, or caused the submission of, 147 claims to Patient 3's insurer, BCBS, for TMS therapy KINRYS supposedly provided. KINRYS's claims reflected that he had provided TMS therapy to Patient 3 five days per week for weeks at a time. In truth, Patient 3 had never been to KINRYS's Natick office where his NeuroStar systems were located and had never received a single TMS therapy session. BCBS paid KINRYS $35,360 for TMS therapy sessions that KINRYS never provided and that Patient 3 never received.

        d.      Patient 4 began seeing KINRYS at KINRYS's Natick office in or around 2015 to receive psychotherapy and assistance managing his medication. Between August 30, 2015 and November 20, 2015, however, KINRYS submitted, or caused the submission of, 55 claims to Patient 4's insurers, Medicare and BCBS, for TMS therapy KINRYS supposedly provided to Patient 4. KINRYS's claims reflected that he had provided TMS therapy to Patient 4

five days per week for weeks at a time. In truth, Patient 4 did not receive a single TMS therapy session. BCBS and Medicare paid KINRYS $10,706 for TMS therapy sessions that KINRYS never provided and that Patient 4 never received.

      e.     Patient 5 began seeing KINRYS in 2016. Between March 28, 2016 and June 17, 2016, KINRYS submitted, or caused the submission of, 58 claims to Patient 5's insurer, BCBS, for TMS therapy he supposedly provided. KINRYS's claims reflected that he was generally providing Patient 5 with TMS therapy five consecutive days per week for three months. In truth, Patient 5 received a total of 10 TMS therapy sessions at KINRYS's office between March 31, 2016 and May 9, 2016, when Patient 5 decided to stop the TMS therapy. BCBS paid KINRYS $11,116 for 48 TMS therapy sessions that he never provided and that Patient 5 never received.

      f.     Patient 6 was a patient of KINRYS's in 2015. Between June 3, 2015 and March 9, 2018, KINRYS submitted 438 claims to Patient 6's insurers, Medicare and BCBS, for TMS therapy KINRYS supposedly provided to Patient 6 at KINRYS's office in Natick. KINRYS's claims reflected that he provided TMS therapy to Patient 6 five days per week for years. In truth, Patient 6 received a total of two TMS therapy sessions at KINRYS's office in September 2017, over two years after KINRYS first began submitting claims for supposed TMS therapy in 2015. BCBS paid KINRYS $7,050 and Medicare paid KINRYS $56,224 for TMS therapy sessions that KINRYS never provided and that Patient 6 never received.

      g.     Patient 7 was a patient of KINRYS's in 2017. Between July 6, 2017 and November 17, 2017, KINRYS submitted 94 claims to Patient 7's insurer, Aetna, for TMS therapy KINRYS supposedly provided. KINRYS's claims reflected that he often provided TMS

14

therapy to Patient 7 five days per week.  In truth, Patient 7 only received 28 TMS therapy

sessions, with her last session occurring on October 23, 2017.  Aetna paid KINRYS $30,385 for

TMS therapy sessions that KINRYS never provided and that Patient 7 never received.

*KINRYS Billed Medicare and Private Insurers for Face-to-Face Psychotherapy He Did Not*
*Provide, Including Psychotherapy He Purportedly Provided While his Patients*
*Were Outside the State or Country*

43.     KINRYS routinely submitted, or caused Billing Company to submit, claims for

psychotherapy and E/M services (using CPT codes 90836 and 99214) that he did not provide to

his patients, including the patients below, some of whom were out of the state on the dates

KINRYS supposedly provided the face-to-face therapy in Natick, Massachusetts.

        a.     Patient 8 began seeing KINRYS in August 2016 shortly before he was set

to begin attending college outside Massachusetts.  Between August 2, 2016 and July 5, 2017,

KINRYS submitted, or caused Billing Company to submit, 39 claims to Optum for

psychotherapy and E/M services he supposedly provided to Patient 8.  In truth, Patient 8 was in

New Hampshire attending college for the 15 face-to-face sessions KINRYS billed between

September 14, 2016 and December 20, 2016 and did not receive face-to-face or any other

psychotherapy and E/M services from KINRYS during that time.  Moreover, Patient 8 was out of

the country on December 27, 2016, and January 3, 2017 when KINRYS billed for supposedly

providing Patient 8 with face-to-face psychotherapy and E/M services.  In truth, Patient 8 saw

KINRYS on fewer than 5 occasions.  Optum paid KINRYS $2,169 for psychotherapy and E/M

services that KINRYS never provided and that Patient 8 never received.

        b.     Patient 9 saw KINRYS for the first time in 2017 to discuss undergoing

TMS therapy.  Between October 30, 2017 and February 22, 2018, KINRYS submitted, or caused

15

Billing Company to submit, 25 claims to Medicare for psychotherapy and E/M services he

supposedly provided to Patient 9. In truth, Patient 9 never received psychotherapy from

KINRYS and only met KINRYS on one occasion. Medicare paid KINRYS $3,522 for

psychotherapy and E/M services that KINRYS never provided and that Patient 9 never received.

Also, KINRYS submitted, or caused Billing Company to submit, 46 claims for TMS therapy

between October 30, 2017 and January 5, 2018 when, in truth, Patient 9 only received a total of

10 TMS therapy sessions. Medicare paid KINRYS $5,366 for 36 TMS therapy sessions he never

provided and that Patient 9 never received.

        c.     As described above, Patient 3 was a patient of KINRYS's. Between May

8, 2014 and December 30, 2016, KINRYS submitted, or caused Billing Company to submit, 63

claims to BCBS for psychotherapy and E/M services he supposedly provided to Patient 3. In

truth, Patient 3 never received psychotherapy from KINRYS and only met with KINRYS

approximately three times per year for medication management. BCBS paid KINRYS $13,526

for psychotherapy and E/M services that KINRYS never provided and that Patient 3 never

received.

        d.     Individual 1 was not a patient of KINRYS's. Individual 1 took her

daughter to see KINRYS in 2013 in an effort to treat her depression. Between June 6, 2017 and

November 15, 2017, KINRYS submitted, or caused Billing Company to submit, 24 claims to

BCBS for psychotherapy and E/M services he supposedly provided to Individual 1 (as opposed

to Individual 1's daughter). Included among those claims were claims for supposed face-to-face

psychotherapy sessions KINRYS provided on July 11 and July 18, 2017, when KINRYS was out

of the country. In truth, Individual 1 was never a patient of KINRYS's and never received

16

psychotherapy or E&M services from KINRYS.  BCBS paid KINRYS $3,626 for psychotherapy and E/M services that KINRYS never provided and that Individual 1 never received.

        e.      Patient 11 began seeing KINRYS in March 2015 for psychotherapy. Between March 17, 2015 and November 30, 2016, KINRYS submitted, or caused Billing Company to submit, 86 claims to Patient 11's insurer, Tufts, for psychotherapy and E/M services he supposedly provided to Patient 11 during that time.  In truth, Patient 11 received far fewer than 86 psychotherapy and E/M services from KINRYS.  Moreover, KINRYS submitted, or caused Billing Company to submit, 17 of the 86 claims for psychotherapy and E/M services during the following time periods when Patient 11 was out of the United States and, therefore, unable to receive face-to-face therapy:  July 14, 2015 to September 29, 2015 (12 claims); December 15, 2015 to December 29, 2015 (two claims); and July 6, 2016 to July 19, 2016 (three claims).  Tufts paid KINRYS $6,575 for treatment KINRYS never provided and that Patient 11 never received during these periods of time when Patient 11 was out of the country.  Patient 11 also received some TMS therapy at KINRYS's office.  Between September 14, 2015 and July 29, 2016, KINRYS also submitted 185 claims to Tufts for TMS therapy he supposedly provided. KINRYS's claims reflected that he often provided TMS therapy to Patient 11 five days per week and during times when Patient 11 was out of the country.  In truth, Patient 11 only received 39 TMS therapy sessions before stopping the treatment in June 2016.  Tufts paid KINRYS $38,197 for 149 TMS therapy sessions that KINRYS never provided and that Patient 11 never received.

*KINRYS Billed Medicare and Private Insurers for Face-to-Face Psychotherapy and E/M
Services KINRYS Claimed He Provided on Days When He was Not in the United States*

44.    KINRYS submitted, or caused Billing Company to submit, claims for
psychotherapy and E/M services (using CPT codes 90836 and 99214) he purportedly provided to
patients when he was out of the United States and, therefore, unable to provide the face-to-face
treatment required to bill for those services.

45.    KINRYS traveled outside the United States five times between 2015 and 2017 on
the following dates:

- July 10, 2015 through July 24, 2015

- August 28, 3015 through August 30, 2015

- July 23, 2016 through July 30, 2016

- February 18, 2017 through February 26, 2017

- July 7, 2017 through July 25, 2017

46.    During these timeframes, KINRYS could not have provided face-to-face
psychotherapy or E/M services to his patients and, therefore, could not bill Medicare or private
insurers for those treatments (using CPT codes 99214 and 90836).  Nevertheless, KINRYS
submitted claims, or caused Billing Company to submit claims, for over 1,000 sessions where he
billed for E/M services with psychotherapy to over 200 different patients during these
timeframes.

47.    KINRYS also took steps to prevent Billing Company from learning that he was
out of the country during periods of time when he was providing Billing Company with billing
sheets falsely stating that he was providing face-to-face psychotherapy.   On July 11, 2017, for
example, Employee A at Billing Company emailed KINRYS, asking him if he had "any vacation

18

plans this summer." On Thursday, July 13, 2017, while on a two-and-a-half week trip outside the United States, KINRYS responded: "Just weekends here and there ... no rest for the wicked! ;-)." Despite being out of the country from July 7 through July 25, 2017, KINRYS emailed Billing Company on July 17, 2017 and attached a billing sheet falsely claiming that he had provided face-to-face psychotherapy and E/M services to numerous patients between July 10 and July 17, 2017.

48.     In total, Medicare, BCBS, Tufts, Aetna, Optum, and Beacon paid KINRYS $206,886 for psychotherapy and E/M sessions he did not provide to patients while he was outside the country, including those patients identified immediately below:

| Patient | Dates of Service on which KINRYS Claimed to Provide Psychotherapy While OUS | CPT Codes Identified | Insurer | Amount Paid for Psychotherapy KINRYS Claimed to Provide While OUS |
|---------|---------------------------------------------------------------------------|---------------------|---------|------------------------------------------------------------------|
| Patient 10 | 7/10/17, 7/14/17, 7/17/17, 7/21/17, 7/24/17 | 99214 & 90836 | Aetna | $1,575 paid to KINRYS |
| Patient 12 | 7/7/17, 7/10/17, 7/14/17, 7/17/17, 7/21/17, 7/24/17 | 99214 & 90836 | Medicare & BCBS | $1,133 paid to KINRYS |
| Patient 13 | 2/20/17, 2/24/17, 7/7/17, 7/10/17, 7/14/17, 7/17/17, 7/21/17, 7/24/17 | 99214 & 90836 | Medicare & BCBS | $1,564 paid to KINRYS |
| Patient 4 | 7/16/15, 7/23/15, 7/11/17 | 99214 & 90836 | Medicare & BCBS | $584 paid to KINRYS |
| Patient 14 | 7/26/16, 2/20/17, 2/22/17, 2/24/17, 7/7/17, 7/10/17, 7/14/17, 7/17/17, 7/21/17, 7/24/17 | 99214 & 90836 | Medicare & Tufts | $1,682 paid to KINRYS |
| Patient 15 | 7/11/17, 7/12/17, 7/18/17, 7/19/17, 7/25/17 | 99214 & 90836 | Medicare & Tufts | $928 paid to KINRYS |
| Patient 11 | 7/14/15, 7/21/15, 7/26/16 | 99214 & 90836 | Tufts | $1,080 paid to KINRYS |
| Patient 16 | 7/25/16, 7/28/16, 7/29/16, 2/20/17, 2/24/17 | 99214 & 90836 | BCBS | $698 paid to KINRYS |

*On Hundreds of Days, KINRYS Billed Medicare and Private Insurers for an Impossible
Number of Therapy Sessions that He Supposedly Provided in a Single Day*

49.     On hundreds of occasions, KINRYS submitted claims, or caused Billing

Company to submit claims, for providing a number of psychotherapy sessions and E/M services

(using CPT codes 99214 and 90836) that one could not possibly provide in a single day because

it would have required more than 24 hours.

50.     For example, on or about September 26, 2017, KINRYS submitted claims for

supposedly providing psychotherapy and E/M services to 79 different patients on September 18,

2017.  To legitimately submit claims for those sessions, KINRYS would have had to spend

approximately one hour face-to-face with each of these 79 patients, or 79 hours in a single day.

Collectively, Medicare, BCBS, Tufts, Aetna, and Beacon paid KINRYS $15,208 for the

psychotherapy and E/M services he purportedly provided to 79 patients on September 18, 2017.

51.     Between January 1, 2015 and December 31, 2018, there were over 382 days for

which KINRYS submitted claims, or caused Billing Company to submit claims, to Medicare and

private insurers for providing over 24 hours of psychotherapy and E/M sessions to patients in a

single day.

KINRYS Obstructed Justice by Fabricating and
Directing the Fabrication of Documents and Producing False
Documents Both to CMS Investigators and in Response to an HHS-OIG Subpoena

52.     As early as November 2017, private insurers, including BCBS and Medicare,

began sending KINRYS requests for patient medical records, referred to as Medical Records

Requests ("MRRs") in order to obtain documentation supporting the claims he was submitting

for TMS therapy sessions provided to certain patients.

53.     From late 2017 through early 2018, in order to respond to those MRRs, and in an attempt to conceal his fraudulent billing, KINRYS created documents, and ordered his office workers to create documents, falsely stating that certain patients had received TMS therapy in an amount and frequency much greater than they had in fact received.

54.     As a result of the insurers' MRRs, KINRYS directed one of his office workers, Employee 1, to create reports falsely showing that certain patients had received TMS therapy five days per week for 36 visits, when, in truth, those patients had not received TMS therapy in that amount or at that frequency.

55.     At KINRYS's direction, Employee 1 created numerous "NeuroStar TMS Therapy Patient Reports" (hereinafter, "TMS Patient Reports") that falsely stated that specific patients had received TMS therapy in high amounts and at high frequencies.  To make the reports look more legitimate, KINRYS directed Employee 1 to modify the content of the false reports to make it appear that a patient's condition was improving over time.  To that end, KINRYS directed Employee 1 to include in the TMS Patient Reports fabricated scores on a 9-question assessment instrument called the "PHQ-9" to make it appear that the patient's mental condition was improving as a result of the TMS treatment.  In some instances, the patients were not even taking the PHQ-9.

56.     On or about March 23, 2018, investigators from CMS arrived at KINRYS's office in Natick seeking medical records for five specific patients to support the Medicare claims for services KINRYS had submitted for those patients.  There were no patient files at KINRYS's Natick office reflecting this information.  Employee 1 contacted KINRYS and provided him with the names of the patients for whom the CMS investigators were seeking records.  Over an hour

later, KINRYS arrived at his Natick office where the investigators were waiting and provided the

investigators with false TMS Patient Reports for Patient 17, Patient 12, and Patient 6.  The

reports falsely stated that these patients had received far more TMS sessions than they had, in

fact, received.

57.     In late March and April 2018, KINRYS increased his demands on Employee 1 to

create false medical records that KINRYS could in turn provide in response to MRRs from

private insurers.  When Employee 1 continued to express discomfort at the prospect of creating

additional false medical records, KINRYS texted Employee 1 on April 4, 2018:

> [I]t [creating the TMS Patient Reports] has to be done.  I don't have the
> time.  It is part of the job.  That will not change.  That is not open for
> discussion.  Assign it to someone else.  But it has to be done by
> someone.  I need them by the end of the week please.  Please stop
> overthinking things you think you fully understand.

That same day, Employee 1 texted her co-worker that the situation had "gotten too far" and that

Employee 1 "[couldn't] be bullied by G [KINRYS] to forge records."  Employee 1 quit that day

and stopped going to work.

58.     On July 10, 2018, HHS's Office of Inspector General ("HHS-OIG") issued a

subpoena to KINRYS requesting that he produce medical records for ten specific patients "in

connection with an investigation into possible false or otherwise improper claims submitted for

payment" to Medicare.  The HHS-OIG subpoena directed KINRYS to bring or mail the

documents to a special agent at HHS-OIG by July 24, 2018.  The subpoena requested "copies of

the original medical records for all services rendered" to those ten patients during specific

periods of time.

59. On July 24, 2018, KINRYS, through his attorney, produced false medical records to the HHS-OIG special agent, including false TMS Patient Reports for all ten of the patients. As described below, those TMS Patient Reports falsely stated that the patients had received TMS therapy in an amount and frequency that, in truth, they had not received.

| Patient for Whom Kinrys Produced a False TMS Patient Report | Number of False entries on TMS Patient Report? |
| --- | --- |
| Patient 18 | 17 of 37 entries false |
| Patient 12 | 50 of 72 entries false |
| Patient 19 | 36 of 70 entries false |
| Patient 14 | 40 of 71 entries false |
| Patient 13 | 47 of 71 entries false |
| Patient 20 | 50 of 71 entries false |
| Patient 15 | 64 of 92 entries false |
| Patient 6 | 69 of 71 entries false |
| Patient 9 | 62 of 72 entries false |
| Patient 21 | 43 of 71 entries false |

60. Between July 24, 2018 and August 2, 2018, KINRYS created false TMS Patient Reports for at least three of the patients identified in the HHS-OIG subpoena. On August 2, 2018, KINRYS, through his attorney, produced those false TMS Patient Reports (as described below) to the HHS-OIG special agent.

| Patients for whom Kinrys Created a False TMS Patient Report | Number of False entries on TMS Patient Report? |
| --- | --- |
| Patient 6 | 48 out of 48 entries false |
| Patient 13 | 41 out of 44 entries false |
| Patient 20 | 42 out of 44 entries false |

61. On October 15, 2018, KINRYS, through his attorney, produced additional false medical records for the ten patients identified in the HHS-OIG subpoena.

62. Included in KINRYS's October 15, 2018 production were 124 pages of progress notes pertaining to 24 psychotherapy sessions KINRYS purported to provide to Patient 12.

KINRYS's signature appeared at the end of each progress note and included the following statement: "Time spent face to face with patient and / or family and coordination of care: 52-67 minutes." In truth, Patient 12 never received psychotherapy from KINRYS and only met KINRYS on two occasions. Also, the false progress notes KINRYS produced included references to six face-to-face psychotherapy sessions KINRYS supposedly provided to Patient 12 between July 7, 2017 and July 25, 2017 when, in fact, KINRYS was out of the country and unable to provide face-to-face psychotherapy.

63.     Also included in KINRYS's October 15, 2018 document production were 139 pages of progress notes describing 32 psychotherapy sessions KINRYS purported to provide to Patient 18. KINRYS's signature appeared at the end of each progress note and included the following statement: "Time spent face to face with patient and / or family and coordination of care: 52-67 minutes." In truth, Patient 18 met with KINRYS fewer than ten times face–to-face.

COUNTS ONE – SEVEN
Wire Fraud
(18 U.S.C. §§ 1343 & 2)

The Grand Jury charges:

64.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62 of this Indictment.

65.     Between in or about January 2015 and December 2018, including on or about the dates listed below, in the District of Massachusetts and elsewhere, the defendant,

GUSTAVO KINRYS,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Date | KINRYS Email with attached billing sheet | Insurer / Resulting Claim No. | CPT Code | Patient | Amount Billed / Paid |
|-------|------|------------------------------------------|-------------------------------|----------|---------|----------------------|
| 1 | 11/24/2015 | Email from KINRYS to Employee A attaching Billing Sheet #121 and noting "My billing sheets for the week of 11/16-11/20." | Medicare 700215337016930<br><br>BCBS 026153563814300N | 90868 | Patient 4 | $475 / $160.49<br><br>$475 / $40.94 |
| 2 | 7/5/2016 | Email from KINRYS to Employee A attaching Billing Sheet #153 and noting "My billing sheets for the week of 06/27-07/01." | Tufts 6189BINS | 90868 | Patient 11 | $475 / $475 |

| 3 | 12/11/2016 | Email from KINRYS to Employee A attaching Billing Sheet #176 and noting "My billing sheets for the week of 12/05-12/09." | BCBS 027163550154100N | 90868 | Patient 3 | $475 / $243.23 |
| 4 | 1/10/2017 | Email from KINRYS to Employee A attaching Billing Sheet #180 and noting "My billing sheets for the week of 01/02-01/06." | Optum 17X0185124 | 99214 & 90836 | Patient 8 | $610 / $120.50 |
| 5 | 7/17/2017 | Email from KINRYS to Employee A attaching Billing Sheet #207 and noting "My billing sheets for the week of 07/10-7/14" | BCBS 027172013446300N<br><br>Aetna E2Y0ZBVRZ00 | 90868<br><br>99214 & 90836 | Patient 1<br><br>Patient 10 | $475 / $228.23<br><br>$610 / $262.50 |
| 6 | 7/24/2017 | Email from KINRYS to Employee A attaching Billing Sheet #208 and noting "My billing sheets for the week of 07/17-07/21 …" | BCBS 027172074604800N | 99214 & 90836 | Individual 1 | $610 / $213.39 |
| 7 | 9/26/2017 | Email from KINRYS to Employee A attaching Billing Sheet #217 and noting "My billing sheets for the week of 09/18-09/2[sic]." | Aetna EZTWZ7LPV00<br><br>Medicare 700217271024730 | 99214 & 90836<br><br>99214 & 90836 | Patient 10<br><br>Patient 17 | $610 / $262.50<br><br>$610 / $155.21 |

All in violation of Title 18, United States Code, Sections 1343 & 2.

COUNTS EIGHT – THIRTEEN
False Statements Relating to Health Care Matters
(18 U.S.C. §§ 1035 & 2)

The Grand Jury further charges:

66.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62

of this Indictment.

67.     On or about the dates listed below in the District of Massachusetts and elsewhere,

the defendant,

GUSTAVO KINRYS,

in matters involving a health care benefit program, as defined in 18 U.S.C. § 24(b), and as

specified below, did knowingly and willfully make materially false, fictitious and fraudulent

statements and representations, and make and use materially false writings and documents,

knowing the same to contain materially false, fictitious and fraudulent statements and entries, in

connection with the delivery of and payment for healthcare benefits, items, and services, that is,

KINRYS caused false claims to be submitted to the healthcare benefit programs identified below

for (1) TMS sessions and (2) psychotherapy sessions and E/M services that were not provided

when KINRYS knew, in fact, that those services had not been provided:

| Count | Date of Offense | Patient | Alleged Date of Service | CPT Code at Issue | Health Care Benefit Program |
|-------|-----------------|---------|-------------------------|-------------------|-----------------------------|
| 8 | 11/9/2015 | Patient 4 | 11/2/2015 | 90868 | Medicare BCBS |
| 9 | 4/13/2016 | Patient 1 | 4/8/2016 | 90868 | BCBS |
| 10 | 7/25/2016 | Patient 11 | 7/19/2016 | 99214 & 90836 | Tufts |
| 11 | 12/19/2016 | Patient 3 | 12/12/2016 | 90868 | BCBS |
| 12 | 1/17/2017 | Patient 8 | 1/10/2017 | 99214 & 90836 | Optum / Harvard Pilgrim |
| 13 | 12/26/2017 | Patient 18 | 12/19/2017 | 99214 & 90836 | Medicare Beacon |

27

All in violation of Title 18, United States Code, Sections 1035 & 2.

COUNT FOURTEEN
Destruction, Alteration, or Falsification of Records in Federal Investigations
(18 U.S.C. §§ 1519 and 2)

The Grand Jury further charges:

68.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62
of this Indictment.

69.     Between on or about July 31, 2018 and August 2, 2018, in the District of
Massachusetts, the defendant,

GUSTAVO KINRYS,

knowingly altered, falsified and made a false entry in records, documents, and tangible objects,

that is, TMS Patient Reports for Patient 6, Patient 13, and Patient 20 (as identified in a July 10,

2018 HHS-OIG subpoena) with the intent to impede, obstruct, and influence the investigation

and proper administration of a matter that KINRYS contemplated was within the jurisdiction of

the Department of Health and Human Services, Office of Inspector General, which is an agency

of the United States, and aided, abetted, counseled, commanded, induced, and procured the same.

All in violation of Title 18, United States Code, Sections 1519 and 2.

COUNT FIFTEEN
Obstruction of a Criminal Investigation of a Health Care Offense\*
(18 U.S.C. §§ 1518 and 2)

The Grand Jury further charges:

70.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62 of this Indictment.

71.     Between on or about July 12, 2018 and October 15, 2018, in the District of Massachusetts, defendant,

GUSTAVO KINRYS,

willfully prevented, obstructed, misled, and delayed, and attempted to prevent, obstruct, mislead, and delay the communication of information and records relating to a violation of a Federal health care offense to a criminal investigator, to wit:  In response to a July 10, 2018 HHS-OIG subpoena seeking records in connection with an investigation into possible false or otherwise improper claims submitted for payment to Medicare, KINRYS knowingly provided to an HHS-OIG Special Agent false TMS Patient Reports and Progress Notes for Patient 18, Patient 12, Patient 19, Patient 14, Patient 13, Patient 20, Patient 15, Patient 6, Patient 9, and Patient 21.

All in violation of Title 18, United States Code, Sections 1518 and 2.

CRIMINAL FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The Grand Jury further finds:

72.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1343, 2, 1035 and 1518, set forth in Counts One through Thirteen and Fifteen, the defendant,

GUSTAVO KINRYS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to the following:

    a.    The real property located at 4 Goose Cove Way, Nantucket, Massachusetts; and

    b.    The real property located at 2 Fuller Brook Road, Wellesley, Massachusetts.

73.    If any of the property described in Paragraph 72, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(7), as a result of any act or omission of the defendant --

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

31

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 72 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

A TRUE BILL

FOREPERSON

PATRICK M. CALLAHAN
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: December ___7___, 2020
Returned into the District Court by the Grand Jurors and filed.

/s/ Dawn M. King 3:05pm
DEPUTY CLERK

32