UNITED STATES DISTRICT COURT
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GUSTAVO KINRYS,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>) Criminal No. 1:20-cr-10307-DPW<br>)<br>)<br>)<br>)<br>) |

**GOVERNMENT'S TRIAL BRIEF**

The United States respectfully submits this trial brief to identify issues relevant to the trial scheduled to begin on October 11, 2022 in the above-captioned manner.

**I.    THE INDICTMENT AND A SUMMARY OF THE CASE**

The defendant, Dr. Kinrys, was a licensed psychiatrist residing in Wellesley MA, who owned and operated a medical practice, Advanced TMS Associates (aka Boston Center for Clinical Research ("BCCR")) located in Natick, MA. Dkt. No. 1, Indictment ("Ind.") ¶¶ 1,3.

The indictment alleges that, from January 2015 through December 2018, Kinrys billed insurers for millions of dollars of psychiatric medical treatments that he never provided. Ind. ¶ 4. Specifically Kinrys (i) billed insurers more than $10 million for thousands of sessions of transcranial medical stimulation ("TMS") therapy sessions that never occurred and (ii) billed insurers for more than one thousand sessions of face-to-face therapy that never happened—including sessions occurring when either Kinrys or the patient supposedly receiving face-to-face therapy was outside of the United States and instances in which Kinrys billed for more than 24-hours of face-to-face therapy in a single day. *Id.*

When insurers and the United States Office of Health and Human Services investigated Kinrys' excessive and fraudulent billing practices, Kinrys made false representations and created false

documentation of treatment sessions that had never taken place with the intent of obstructing that investigation. *Id.*

        A.       *TMS Therapy, Neuronetics, Inc., and the NeuroStar TMS Therapy System*

TMS therapy involves the use of non-invasive magnetic brain stimulation to treat patients diagnosed with major depressive disorder. Ind. ¶ 11. Neuronetics, Inc. manufactured and sold a medical device used to provide TMS therapy called the NeuroStar TMS Therapy System ("NeuroStar System"). *Id.*

Along with the NeuroStar System, Neuronetics also sold bundles of TMS treatment sessions. Ind. ¶ 12. The NeuroStar System was designed so that the number of TMS treatment sessions *provided to patients* was limited to the number of sessions *purchased from NeuroStar*. *Id.* If a healthcare provider, like Dr. Kinrys, attempted to provide more treatment sessions than that provider had purchased from Neuronetics, the NeuroStar System would provide an error message and not permit the provider to administer any more treatment sessions. *Id.*

The NeuroStar System was equipped with a cloud-based patient data management system called "TrakStar." TrakStar maintains a record of every NeuroStar System treatment session purchased by a provider and every NeuroStar System treatment session provided to a patient. TrakStar also maintains patient-specific data including: (i) patient name and demographics; and (ii) date and time of the treatment sessions. Through TrakStar, Neuronetics maintains a record of every TMS treatment session provided using a NeuroStar System.

When submitting claims for payment to health insurance companies, whether Medicare or a private insurer like Blue Cross Blue Shield, health care providers describe the type and level of service provided using five-digit codes taken from the manual of Physicians Current Procedural Terminology ("CPT codes") published by the American Medical Association. Ind. ¶ 8. By submitting a claim to an insurer with an associated CPT code, health care providers represent to the insurer that the services described by

the associated CPT codes were actually performed and that those services were medically necessary for the care and treatment of the patient. *Id.* The American Medical Association has published three CPT codes associated with the provision of TMS therapy:

- CPT Code 90867 – "[T]herapeutic repetitive transcranial magnetic stimulation treatment; initial, including cortical mapping, motor threshold determination, delivery and management."
- CPT Code 90868 – "[S]ubsequent delivery and management, per session."
- CPT Code 90869 – "[S]ubsequent motor threshold re-determination with delivery and management."

Ind. ¶ 13.

    B.    *Psychotherapy and Evaluation and Management (E/M) Services*

In addition to TMS therapy, Kinrys also provided and billed for evaluation and management ("E/M") services (also referred to as office visits) and psychotherapy sessions he purportedly provided to his patients beginning in at least January 2015. Ind. ¶ 20.

Insurers paid health care providers increasing amounts based upon the complexity of the E/M services provided. Ind. ¶ 21. CPT Code 99214 was the appropriate code for an office visit for an established patient that required at least two of the following three key components: (i) a detailed history; (ii) a detailed examination; and/or (3) medical decision-making of moderate complexity. For E/M services properly billed under CPT Code 99214, psychiatrists typically spend approximately 25 minutes face-to-face with the patient and/or family. Ind. ¶ 22.

Psychotherapy involves the treatment of mental health disorders by a health care provider through definitive therapeutic communication, attempting to alleviate emotional disturbances, change maladaptive patterns of behavior, and encourage personality growth and development. Ind. ¶ 23.

The CPT codes associated with psychotherapy were 90832, 90833, 90834, 90836, 90837, and 90838. For a psychiatrist to submit claims under those CPT codes, the patient and psychiatrist were required to be in the same location for all, or at least the majority of the therapy session. Ind. ¶ 24. CPT

code 90836 was the appropriate code to bill for a 45-minute psychotherapy session when it was an "add-on" to an E/M session. Ind. ¶ 25. A different code, 90834, was the appropriate code to bill for a 45-minute psychotherapy session without a separate E/M session.

For a psychiatrist to submit a claim for services billed under both CPT code 99214 and CPT code 90836 for treatment provided to the same patient on a single day, the two services (E/M and psychotherapy) were required to be "significant and separately identifiable," and the psychiatrist would be required to spend a total of at least 60-minutes face-to-face with the patient. Ind. ¶¶ 25-26.

    C.    *Kinrys' Billing Practices*

Kinrys contracted with a billing company, SBSC, Inc. ("SBSC") to submit claims to Medicare and private insurers for E/M services, psychotherapy, and TMS therapy. Most weeks, Kinrys emailed a billing sheet to SBSC listing the services supposedly provided. The billing sheet identified: (i) the patient/beneficiary; (ii) the date of service; and (iii) the CPT codes for the services purportedly provided. Based upon the information Kinrys provided, SBSC would prepare and submit claims for repayment to Medicare and private insurance companies.

Upon receipt of the submission of claims from SBSC, Medicare and private insurers provided checks payable to Kinrys, which he deposited, or made electronic funds transfers to bank accounts controlled by Kinrys. Ind. ¶ 28.

    D.    *The Fraudulent Billing*

        1.    <u>Billing for TMS Sessions That Were Never Provided.</u>

Kinrys purchased a NeuroStar System for his office in or about May 2015 and purchased a second NeuroStar System in February 2018. Ind. ¶¶ 14, 16.

Between June 1, 2015 and October 24, 2018, Kinrys purchased credits for a total of 5,594 TMS treatment sessions from Neuronetics and, according to Neuronetics records, provided a total of 5,587 TMS

4

treatment sessions. Despite this, Kinrys submitted bills, or caused SBSC to submit bills, for over 26,200 TMS treatment sessions under CPT codes 90867, 90868, or 90869. Ind. ¶ 19.

        2.        <u>Billing for Face-to-Face Therapy Sessions That Did Not Occur</u>

In addition to billing for TMS sessions that never occurred, Kinrys also billed for E/M and psychotherapy sessions that he never provided. Notably:

- Kinrys billed for 1,175 face-to-face E/M and psychotherapy sessions that supposedly took place on dates that either Kinrys or the patient were outside of the United States, (Ind. ¶ 4); and

- On at least 382 occasions, Kinrys submitted claims, or caused the submission of claims, to insurers representing that Kinrys had provided in excess of 24 hours of face-to-face E/M and/or psychotherapy care in a single day, Ind. ¶ 51.

    E.    *Fabrication and Production of False Records to Obstruct Justice*

Beginning in at least November 2017, insurers, including Blue Cross Blue Shield and Medicare submitted medical record requests ("MRRs") to Kinrys seeking documentation supporting the claims he was submitting for TMS therapy sessions purportedly provided to patients. Ind. ¶ 52. In response, Kinrys directed his office employees to create reports falsely showing that patients had received TMS therapy far more often than they in fact had. Ind. ¶¶ 54-57.

On July 10, 2018, HHS's Office of Inspector General issued a subpoena to Kinrys requesting that he produce medical records for ten specific patients. Ind. ¶ 58. The subpoena specified that it was issued "in connection with an investigation into possible false or otherwise improper claims submitted for payment" to Medicare and directed Kinrys to bring or mail "copies of the original medical records for all services rendered" to the ten patients to a special agent at HHS-OIG by July 24, 2018. *Id.*

In response, on July 24, 2018, August 2, 2018, and October 15, 2018, Kinrys, through his attorney, produced falsified medical records reflecting that patients had received TMS therapy and, in some instances, face-to-face psychotherapy sessions on far more occasions than they in fact had. Ind. ¶¶ 59-63.

F.   The Counts

    1.   Counts 1 – 7 (Wire Fraud, 18 U.S.C. §§ 1343 & 2)

Each wire fraud count is associated with an email from Kinrys to SBSC (his billing company), sent in interstate commerce on the date specified in the indictment. *See* Ind. ¶ 65. The billing sheet attached to each email represented that Kinrys had performed specified services (identified by the relevant CPT codes) for a specific patient that, in fact, had not been performed. *Id.* For each count, the indictment sets forth: (i) the date of the email; (ii) the relevant CPT code(s); (iii) the specific patient; (iv) the insurer; (v) the resulting claim number; and (iv) the amount billed to and paid by the insurer. *Id.*

    2.   Counts 8 – 13 (False Statements Relating to Health Care (18 U.S.C. §§ 1035 & 2)

Each count of false statements related to health care fraud is associated with a specific false claim for reimbursement that Kinrys submitted, or caused to be submitted, to a health insurer. *See* Ind. ¶ 67. For each count, the indictment sets forth: (i) the date of the offense (i.e., the date of submission of the false claim); (ii) the alleged date of service; (iii) the specific patient for whom services were purportedly provided; (iv) the relevant CPT code(s); (v) and the health insurer to whom the claim was submitted.

    3.   Count 14 (Destruction, Alteration, or Falsification of Records in Federal Investigations (18 U.S.C. §§ 1519 & 2)

On July 10, 2018, HHS's Office of Inspector General issued a subpoena to Kinrys requesting that he produce medical records for ten specific patients. Count 14 alleges that Kinrys, in response, between July 31, 2018 and August 2, 2018, Kinrys knowingly altered, falsified, and made false entries in TMS patient reports for three specified patients with the intent to impede, obstruct and influence HHS-OIG's investigation.

        4.       <u>Count 15 (Obstruction of a Criminal Investigation of a Health Care Offense)</u>

Count 15 alleges that, in response to the July 10, 2018 subpoena, between July 12, 2018 and October 15, 2018, Kinrys submitted falsified TMS patient reports and progress notes for ten specified patients.

## II.    WITNESSES AND EVIDENCE

The following is description of witnesses the government anticipates calling at trial, the anticipated topics of their testimony, and exhibits and categories of exhibits that the government anticipates introducing through these witnesses. The government will provide its witness and exhibit lists on September 30, 2022 in accordance with the Court's scheduling order (Dkt. No. 70) and reserves the right to supplement or modify its evidence as it continues to prepare for trial.

### A.    *Neuronetics Employee*

The government anticipates calling employee(s) of Neuronetics, Inc., to testify concerning the following subjects:

- General background of Neuronetics, Inc., and the role of the employee(s) at Neuronetics;

- The design and set up of the NeuroStar System;

- The operation of the NeuroStar System and its use for treatment of major depressive disorder using transcranial magnetic stimulation;

- Neuronetic's sale of TMS treatment sessions / credits for TMS treatment sessions—and specifically that the number of TMS treatment sessions provided using a NeuroStar System is limited to the number of TMS treatment session credits purchased from Neuronetics;

- Neuronetic's TrakStar system and the data maintained by Neuronetics concerning the operation of the NeuroStar System, including—for every treatment session provided by a NeuroStar System—the following data: (i) dates and times of service; (ii) patient name and identifiers; (iii) and (iv) treating physician or operator;

- Kinrys' purchase of a first NeuroStar System in May 2015 and a second NeuroStar System in March 2018;

- Kinrys' periodic purchase of credits for TMS treatment sessions and the total number of treatment session credits purchased by Kinrys between June 2015 and October 24, 2018—5,594;

- The total number of TMS therapy sessions provided by Kinrys' two NeuroStar Systems between June 2015 and October 24, 2018—5,587;

- The impossibility of Kinrys having provided in excess of 26,000 TMS therapy sessions using the two NeuroStar Systems purchased from Neuronetics;

- Neuronetics records regarding the date, frequency, and number of TMS treatment sessions provided to specific patients—including patients associated with (i) the falsified billing sheets underlying Counts 1 – 7; (ii) the false claims underlying Counts 8 – 13; (iii) the falsified records underlying Count 14; (iv) and the falsified patients reports and progress notes underlying with Count 15.

The government anticipates introducing the following documents or categories of documents through the Neuronetics employee(s):

- Neuronetics' documents illustrating the use and operation of the NeuroStar System and TrakStar System;

- Contracts and transactional documents between Kinrys/BCCR and Neuronetics concerning: (i) Kinrys' purchase of a NeuroStar System in 2015; (ii) Kinrys' purchase of a second NeuroStar System in 2018; and (iii) Kinrys' purchase of credits from Neuronetics for TMS therapy sessions;

- Neuronetics' business records reflecting the date and number of TMS therapy session credits purchased by Kinrys from June 2015 through November 2018; and

- Neuronetics' business records of the TMS therapy sessions provided using the NeuroStar Systems purchased by Kinrys.

B.    *Health Insurer Employees*

The government anticipates calling an employee from each of the following health insurance providers: (i) Medicare/National Government Services; (ii) Blue Cross Blue Shield (iii) Tufts Health Plan; (iv) Aetna; (v) Optum, and (iv) Beacon Health Options.  The government anticipates that these witnesses will testify concerning the following subjects:

- General background on their employer's business, including the process through which health care providers like Kinrys submit claims for reimbursement, the information contained in such claims, and the health insurer's process for evaluating and providing reimbursement for claims;

- The use of CPT codes to identify the medical procedures performed by health care providers;

- CPT codes associated with evaluation and management (including CPT code 99214);

- CPT codes associated with psychotherapy (including CPT code 90836);

- CPT codes associated with TMS therapy (including CPT code 90867, 90868, 90869);

- The circumstances under which the health insurers would—and would not—pay for services billed under the CPT codes listed immediately above;

- Health insurance records concerning claims submitted by, or on behalf of, Kinrys for E/M, psychotherapy, and TMS treatment—including records reflecting claims for procedures purportedly provided to the patients associated with the counts charged in the indictment.

The government anticipates introducing the following documents or categories of documents through these health insurer employees:

- Records of claims data submitted by, or on behalf of, Kinrys for E/M, psychotherapy and TMS treatment to their health insurer—including records reflecting claims for procedures purportedly provided to the patients associated with the counts charged in the indictment; and

- Health care provider agreements executed by the health insurers and Kinrys.

C.     *SBSC, Inc. Employee(s)*

The government anticipates calling one or more individuals who are or were employees of SBSC, Inc. (the billing company Kinrys used). The government anticipates that the SBSC employee(s) will testify concerning the following subjects:

- General background on SBSC, Inc. and the health care billing process;

- Kinrys' submission of billing sheets, including patient names, dates of services, and CPT codes, to SBSC;

- SBSC's preparation and submission of bills to insurance companies based upon the billing sheets Kinrys provided;

- SBSC's reliance on the accuracy and truthfulness of the billing sheets provided by Kinrys; and

- The contents of billing sheets submitted by Kinrys to SBSC, including billing sheets identifying treatment Kinrys purportedly provided to the patients associated with the counts charged in the indictment.

The government anticipates introducing the following documents or categories of documents through the SBSC employee(s):

9

- Emails with attached billing sheets submitted by Kinrys to SBSC, including the emails identified in Counts 1 through 13; and

- Email communication with Kinrys concerning billing, claims for reimbursement, and payment for procedures purportedly provided by Kinrys to his patients.

  D.    *Kinrys' Patients*

The government anticipates calling multiple former patients of Kinrys. The government anticipates these witnesses will testify concerning the following subjects:

- Their medical conditions, including major depressive disorder, anxiety disorders, and other mental health disorders;

- Seeking psychiatric treatment from Kinrys;

- The dates, frequency, number, and type of treatments they received (and did not receive) from Kinrys;

- Periods of time that they were outside of Massachusetts or outside of the United States—corresponding with dates for which Kinrys submitted claims for reimbursement for face-to-face E/M and/or psychotherapy treatment sessions.

The government anticipates introducing the following documents or categories of documents through these patient-witnesses:

- Calendars or date books showing appointment dates with Kinrys; and

- Records showing trips outside the United States or outside Massachusetts.

  E.    *Ex-Employees of BCCR*

The government anticipates calling individuals formerly employed by Kinrys/Boston Center for Clinical Research. The Government anticipates these witnesses will testify concerning the following subjects:

- Their hiring and employment at BCCR;

- The set-up of the office, including the set-up of the NeuroStar Systems;

- Kinrys' in-office schedule;

- Calendars and appointment schedules maintained at Kinrys' offices;

- Kinrys's practices regarding initial TMS sessions and follow-up TMS sessions;

- Inquiries from insurers and Medicare relating seeking records from Kinrys supporting claims he submitted to them through SBSC; and

- The creation of falsified patient medical records at Kinrys' direction.

The government anticipates introducing the following documents or categories of documents through these patient-witnesses:

- Appointment calendars reflecting scheduled medical appointments at Kinrys' medical practices;

- Emails and other communications describing scheduling of patients, interactions with patients, patient complaints about reported sessions of psychotherapy and TMS, instructions regarding the creation of false records; and

- Falsified medical records.

F.   *Law Enforcement Witnesses*

The government anticipates calling law enforcement agent witnesses who will testify about:

- Serving a Department of Health and Human Services subpoena duces tecum on Kinrys, through his counsel, on July 10, 2018 requesting medical records pertaining to ten specified patients;

- Receiving medical records produced by Kinrys, through his attorney, in response to the July 10, 2018 subpoena;

- Insurance claims data obtained by health insurers;

- TMS treatment data obtained from Neuronetics, Inc.;

- Comparisons of information in false medical records produced by Kinrys with information reflected in (i) data produced by Neuronetics, (ii) BCCR appointment calendars; (iii) border crossing records, and (iv) claims data from insurers;

- Bank records of accounts belonging to Kinrys and BCCR; and

- Property records relating to property purchased or owned by Kinrys, specifically real property located at 4 Goose Cove Way, Nantucket, Massachusetts and real property located at 2 Fuller Brook Road, Wellesley, Massachusetts.

During the direct testimony of the law enforcement witnesses, the government anticipates introducing summary charts reflecting the contents of the records and data described immediately above.

G.  *Employee(s) of Liles Parker PLLC*

The government may call attorneys or other individuals employed by Liles Parker PLLC to testify concerning:

- acceptance of service, on Kinrys' behalf, of a Department of Health and Human Services subpoena duces tecum dated July 10, 2018, requesting medical records pertaining to ten specified patients of Kinrys; and

- production of medical records in response to the July 10, 2018 subpoena.

H.  *Keepers of Record*

The government has proposed to defendant stipulations concerning the authenticity and admissibility of records obtained from the six health care benefit programs identified in the Indictment (Aetna, Medicare, Tufts, BCBS, Optum, and Beacon), Bank of America, Oath, Inc., Dropbox, Inc., and Google, Inc.  In the event that the parties are unable to reach a stipulation on these matters, the Government may call keepers of records from these organizations to testify regarding the authenticity and admissibility of documents that have been produced to the government during its investigation.

**III.  STIPULATIONS**

As noted above, the government has proposed to the defendant stipulations concerning the authenticity and admissibility of documentary evidence.  In an attempt to reduce the number of witnesses required and to streamline the presentation of evidence, the government has also proposed to the defendant a number of additional stipulations concerning various factual matters.  In the event that the parties agree to any stipulations, the parties will promptly file them with the Court.

## IV.  ANTICIPATED EVIDENTIARY ISSUES

### A.  *Summaries of Voluminous Documents*

Federal Rule of Evidence 1006 allows the "contents of voluminous writings . . . which cannot conveniently be examined in court [to] be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006.  The government anticipates introducing into evidence summaries of: (i) bank records of accounts belonging to Kinrys and his company, Boston Center for Clinical Research; (ii) claims data from health care benefit programs to which Kinrys submitted claims and from which received reimbursement; (iii) data obtained from Neuronetics concerning TMS treatment sessions provided using the two NeuroStar Systems Kinrys purchased, including the number of sessions, dates of TMS treatment sessions, and the patients receiving TMS treatment; and (iv) medical records Kinrys produced in response to the July 10, 2018 HHS-OIG subpoena.  As required by Federal Rule of Evidence 1006, the government has produced the underlying records to the defendant and the records will be available for the Court at trial.  The government may also independently introduce them into evidence at trial.

In some instances, these charts will juxtapose data from these sources, *e.g.,* by comparing the number of TMS treatment sessions Kinrys billed for (using health insurance claims data) with the number of TMS treatment sessions that were provided using Kinrys' NeuroStar Systems according to data from Neuronetic.  Such charts are appropriately introduced as a "pedagogical device" to "clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or to the jury" and may be introduced into evidence under Rule 611 if they are "sufficiently accurate and reliable." *United States v. Milkiewicz*, 470 F.3d 390, 398 (1st Cir. 2006).  Here, the relevant charts and summaries will be presented in a comprehensible, accurate, and concise form and will assist the jury in understanding the government's presentation.

B.    *Demonstrative Charts*

In addition to summary charts that it will seek to introduce into evidence, the government may also use demonstrative charts during its opening statement, examination of witnesses, and in closing argument. Such charts may include, for example, charts comparing testimony and evidence introduced through different witnesses concerning the number, frequency, and type of treatments provided by Kinrys to his patients and diagrams showing the flow of proceeds from the fraudulent scheme. The government does not intend to offer these charts into evidence. Courts have repeatedly allowed use of charts similar to those the United States intends to use in this case. *See, e.g., United States v. Scales*, 594 F.2d 558, 561-562 (6th Cir. 1979) (summary of indictment); *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir. 1985) (simple flow charts tracing the defendant's use of loan proceeds).

C.    *Introduction of Business Records & Public Records*

The government intends to introduce business records—specifically, bank account records, under Federal Rules of Evidence 803(6) and 902(11) and anticipates filing stipulations concerning the same. As required by Federal Rule of Evidence 902(11), the government provided counsel for the defendant with copies of these records. Copies of certifications obtained pursuant to Federal Rule of Evidence 902(11) were also previously provided.

The government also intends to introduce certain public records, including border crossing records, publicly-filed deeds, and other land records, under Federal Rules of Evidence 803(8) and 803(14). Rule 803(8) provides an exception to the hearsay rule for public records from a public agency or office, relating to an activity of the office. "Records kept … [b]y public agencies may be admissible under the business records exception, Fed. R. Evid. 803(6), as well as under the public records exception, Fed. R. Evid. 803(8)." *United States v. Bohrer*, 807 F.2d 159, 162 (10th Cir. 1986) (internal citations omitted). Federal Rule of Evidence 803(14) separately provides an exception to the hearsay rule for public records that "purport[] to establish or affect an interest in property."

14

D.   *Patient Testimony Concerning Their Mental Health Disorders & Mental Health Treatment*

The government intends to call former patients of Kinrys and to solicit from them limited testimony concerning their mental health disorders that led them to seek treatment from Kinrys, the course of their psychiatric treatment, and the frequency, type, and number of treatments Kinrys provided to them. The government will solicit this testimony in a non-inflammatory, matter-of-fact manner and expects the testimony concerning patients' mental health disorders to be brief. Limited testimony concerning the patients' mental health disorders and their reasons seeking treatment with Kinrys "pertains 'to a chain of events forming the context…and set-up of the crime'" and so is admissible for its "contextual significance.'" *United States v. Sabetta*, 373 F.3d 75, 83 (1st Cir. 2004) (quoting *United States v. Ladd*, 885 F.2d 954, 959 (1st Cir. 1989)). *See also United States v. D'Alora*, 585 F.2d 16, 20 (1st Cir. 1978) ("Evidence is not to be examined in isolation, but in its particular factual setting. Evidence of prior conduct is admissible 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" (quoting 2 WEINSTEIN'S EVIDENCE § 404(09), at 404-57 (1975)). Exclusion of the evidence of these patients' mental health conditions, in contrast, inappropriately would require the government to try the case based on "unreal facts tailored and sanitized for the occasion." *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). *See also Wagenmann v. Adams*, 829 F.2d 196, 217 (1st Cir. 1979) ("A controlled environment for the reception of proof is essential, but an artificially sterile environment is neither necessary nor desirable."). Patient testimony concerning the frequency, type, and number of treatments provided to them by Kinrys is directly relevant to the allegations that Kinrys charged health insurers for treatments that he had never provided and which had never occurred.

E.   *Lay Testimony Concerning CPT Codes*

The government anticipates soliciting testimony from health insurer witnesses concerning CPT codes relating to E/M sessions, psychotherapy, and TMS treatments. The witnesses will testify

concerning the circumstances under which the health insurer for which they work approves or denies claims identifying certain CPT codes and what information is material to the health insurer's decision to approve payment for those claims. This testimony is based on these witnesses' personal observations, their extensive experience working for the specific health insurer, and their participation in the day-to-day operations of their respective health insurers. Such testimony is admissible under Federal Rule of Evidence 701 because it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

    F.    *Calendar Entries*

The government anticipates that it may seek to introduce into evidence calendar entries of two distinct types. First, the government may introduce entries recorded in calendars kept by patients of Kinrys showing scheduled appointments. These entries are not excludable hearsay statements, but instead reflect "the declarant's then existing state of mind . . . such as intent"—that is an intent to attend the future appointments—and so are "not excluded by the hearsay rule." Fed. R. Evid. 803(3). *See also, e.g., United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds. … If relevant, such a statement may be introduced to prove that the declarant thereafter acted in accordance with the stated intent."); *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295-96, 12 S.Ct. 909, 36 L.Ed. 706 (1892); Fed. R. Evid. 803 Advisory Committee Note to Paragraph (3) (1972) ("The rule of *Mutual Life Ins. Co. v. Hillmon* . . . allowing evidence of intention as tending to prove the doing of the act intended, is . . . left undisturbed."); *United States v. Houlihan*, 871 F. Supp. 1495 (D. Mass. 1994).

Second, the government may introduce calendars of appointments from Kinrys' medical practice through employees of Kinrys/BCCR. These calendars are admissible for the reasons above, as well as

the additional reason that they are "record[s] … kept in the course of a regularly conducted activity of a business" and so admissible pursuant to Federal Rule of Evidence 803(6).

## V.     VOIR DIRE AND JURY INSTRUCTIONS

The government has filed its proposed *voir dire* questions and proposed jury instructions today pursuant to the Court's pretrial order.

## VI.    SPECIAL COURTROOM ARRANGEMENTS

a.    *Paralegal*.  The government respectfully requests that, in addition to trial counsel, the Court allow Nanrawee Kitiarsa, a legal assistant with the United States Attorney's Office, to sit at counsel table.  Ms. Kitiarsa is an integral member of the prosecution team and will assist counsel in presenting the government's evidence through the courtroom technology system.

b.    *Witnesses*.  Several of the government's witnesses are traveling from out of state to testify.  Depending on witness schedules and the progress of the trial, the government may request that certain witnesses be allowed to testify out of order.

c.    *Case Agent*.  The government requests that the Court designate HHS-OIG Special Agent Erin Fuller as case agent and that Special Agent Fuller be permitted to sit in the courtroom (not at counsel table) during trial.

d.    *Length of Trial*.  The government expects its case-in-chief to last 13-15 days, excluding jury selection.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | RACHAEL S. ROLLINS<br>United States Attorney |
| Dated: September 20, 2022 | */s/ Christopher Looney*<br>Christopher Looney<br>Patrick Callahan<br>Assistant United States Attorneys |

## **CERTIFICATE OF SERVICE**

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        */s/ Chris Looney*
                                        Christopher Looney
                                        Assistant United States Attorney

Dated: September 20, 2022