IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

        v.                                         Case 1:20-cr-10307 DJC

GUSTAVO KINRYS,
        Defendant.

MEMORANDUM IN OPPOSITION TO
GOVERNMENT'S MOTION FOR RESTITUTION

Preliminary

Defendant respectfully opposes the government's May 15, 2023 Motion for Restitution (Doc. 247). The government's claimed actual loss amount fails to exclude amounts for bills where defendant rendered actual TMS and Evaluation/Maintenance and therapy session.

POINT I: With regard to restitution for fraudulent TMS sessions, there are instances where the carriers may have denied payment on various grounds other than that the service was not rendered. TMS sessions were rendered according to stored Neuronetics electronic data, but the patient's sessions were (1) not paid at all, (2) not paid in full or (2) not credited against actual loss amount. Even if actual TMS sessions provided were not properly billed or documented, this does not mean that these should be included in the amount of the fraud. Restitution for TMS sessions should be reduced from $3,355,016.59 to $2,778.811.00.

POINT II: With regard to restitution for fraudulent face-to-face evaluation/maintenance or therapy sessions under add-on code bills, using the government's figure of no more than 12 sessions per day should be corrected to 18 sessions per day and the loss/restitution amount adjusted accordingly from  As an analysis of testimony shows, the successful fraud evidence at trial of 24 patient "impossible days" does not support the restitution claim that bills for days

1

excess of 12 patients were fraudulent. Restitution for "face-to-face" sessions should be reduced from $2,057,242.02 to $1,583,753.00.

POINT III: Restitution of the legal bills connected with preparing BCBS witnesses should be denied. Except for reasonable cost of services for responding to subpoenas, the attorneys' bills do not state compensable claims under §3663A(b)(4) or Circuit law. The bills are duplicative where BCBS has used three different sets of lawyers. The bills are excessive. The services in the bills were not necessary.

ARGUMENT

POINT I:
SUBSTANTIAL REDUCTION WARRANTED
IN GOVERNMENT'S TMS CLAIM

The government asserts its loss amount of $3,355,016.79 from the total of "Amount Paid" column presented in Agent Horan's 215-line spread sheet introduced at trial. Defendant finds that the government's loss amount in Ex. 239.01 would represent a windfall to the carriers of over $600,000.00. The "MVRA should not be used to give the statutory victims a 'windfall'". See, *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008) citing *United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004).

Each line of Ex. 239.01 shows the following data for an individual patient: patient name, the number of TMS sessions actually rendered to the patient in the Neuronetics data, the number of sessions billed, the amounts defendant billed to carriers and the amounts that carriers actually paid for TMS services to the patient. See, testimony of Agent Horan, Tr. 6/58 - 60, Ex. 239.01. Agent Horan testified that all the claimed loss amounts in Ex. 239.01 are for "TMS Sessions Billed with No Corresponding TMS Sessions Rendered". See, Ex. 239.01 (top line above two

right columns) and testimony introducing the exhibit, Tr. 6/60. Agent Horan's testimony and exhibit reach an actual loss amount of $3,355,016.59 paid on claims for fake TMS sessions. However, that amount does not appear to credit defendant with some or all the unpaid non-fraudulent claims for TMS sessions that the Neuronetics data shows were actually provided to defendant's insured patients. In other words, the restitution amount should not be determined without first crediting defendant for TMS services that were actually performed for a beneficiary of the insurance companies. To do otherwise would give the carriers a prohibited windfall.

Defendant first examines the gross data calculations. The government's exhibit says that insurers paid defendant a total of $4,014,177.90 for all the TMS sessions (fake and real) that defendant billed. Ex. 239.01, p. 5, fn. 4. This exhibit calculates $3,355,016.59 in total fraudulent billing for TMS sessions that had no corresponding TMS data ("fake TMS sessions). *Id.* p. 5. The exhibit uses Neuronetics data to show that Dr. Kinrys used 5,302 of purchased sessions or "tokens" (Greg Harper, Tr. 2/81) to provide TMS therapy to the 215 patients listed in the exhibit. The exhibit also states that there were payments made on 17,170 TMS sessions (fake and real), yielding for counsel an average paid on claim amount of $233.79. Review of the payment data generally confirms that carriers paid this amount on average. The value of all TMS sessions actually rendered, therefore, is approximately $1,235,366.00 ($233 x 5,302). Subtracting that value from the total amount paid would yield a *fraud* amount of $2,778.811.00 and not the $3,355,016.59 total claimed in Ex. 239.01. In other words, Kinrys should be credited for and restitution should be reduced by $1,235,366.00, not just the $659,161.00 that defendant infers from the footnotes the government is treating as validly paid.

Defendant maintains that, in many instances, the values in the amount paid column of Ex. 239.01 (far right column) do not distinguish between amounts for claims denied

3

for billing reasons and values for fraudulent TMS sessions billed but never rendered. Making defendant pay the carriers for the $3,355,016.59 and not giving credit against the total loss would constitute a windfall to the carriers. Perhaps there were legitimate reasons to deny payment on some of these uncredited claims, but defendant did provide uncompensated TMS sessions to an insurance beneficiary; defendant should be credited for these real TMS sessions because they were not fraudulent. The carriers may have civil law defenses to pay defendant for these claims for failure to follow defendant's agreement with them, but they are not entitled to receive restitution without valuing all the TMS sessions. While some carrier claims denials may have owed to failure to obtain "prior authorization" or exceeding total number of allowed sessions, other denials or non-payment likely owed to the fact that carriers stopped paying defendant on all or most claims after August 2017, approximately four months after CMS made a visit to the defendant's clinic. Blue Cross, for example stopped payment on September 21, 2017 for irregularities like refusing to provide records or providing falsified records. Angela Arena testimony, Tr. 3/96 - 97.

The general or gross recalculations above are corroborated by examination of individual data lines. Each set of calculations below, Types 1, 2 & 3 involves unique patient data lines. None of these patient data lines appear in more than one of the three types of calculations. As stated in "Preliminary" *supra,* defendant finds three types of discrepancies where TMS sessions were rendered and billed but not credited against loss amount; namely (1) no sessions paid at all for a patient, (2) sessions not paid in full and (3) sessions not credited against actual loss amount. In each case, crediting the TMS sessions provided would reduce the "Amount Paid" (far right column, Ex. 239.01) on fraudulent claims.

"Type 1", no sessions paid at all. Reviewing Ex. 239.01, counsel finds that carriers failed to pay anything for 28 patients who received TMS sessions (according to Neuronetics data).[1] These are the lines where the right column, "Amount Paid" contains "-", indicating that nothing was paid on the patient's account. Counsel counts over ca. 745 of these unpaid sessions where Neuronetics data shows definitively that the sessions were rendered to the patient. Next, counsel derives a per session average value paid per TMS session from information in the footnotes of trial Ex. 239.01 that "there were payments by the companies on 17,170 sessions totaling $4,014,177.90". This yields a fair average of $233.79 per session paid by carriers. 745 unpaid sessions at $233.00 per session would leave a balance of $173,585.00 in uncredited sessions rendered for the Type 1. recalculation.

"Type 2", some sessions credited but balance in favor of Kinrys probably remaining. Here, the defense takes the number of sessions rendered from the "# TMS Sessions Rendered" column for a given line, multiplies it by the $220.00[2] average and then subtracts that the value listed in the "Amount Paid" column to show a positive amount credited for that patient line.[3] See handwritten calculations Ex. A. In other words, that line should produce a credit, not a reduction in the loss amount. Counsel has yet to complete this recalculation of Ex. 239.01, but he has

---

[1] The witness explains that the column marked "# TMS Sessions Rendered" is the number of sessions in the Neuronetics data provided to that particular patient:  "Q. Okay. Let's go to the next column, "Number TMS Sessions Rendered." What information is contained in that column?  A. That column is the total number of TMS sessions that appeared in the Neuronetics data for that particular patient.  Neuronetics representative Greg Harper testified that company records reflected Dr. Kinrys purchasing 5,794 sessions.  Tr. 2/100.
[2] Counsel had initially used an average value for TMS sessions of $220.00 when making these calculations.
[3]  Counsel continues to calculate this value for the whole of Ex. 239.01 and has finished the last page of the exhibit where the number of sessions actually rendered according to Neuronetics data is the highest.

examined the last 20 lines of the exhibit. Counsel finds a value of credits on lines 195 to 215 for $98,681.00.

"Type 3", loss amount to be reduced by value of TMS sessions. Lastly, there are distinct patient line data that appear to fail to credit actual TMS sessions so that a reduction of the value entered in the "Amount Paid" column is warranted. See attached, Ex. A. Recalculating only these patient lines would yield a $366,870.00 reduction in the $3,355016.00 total loss amount. Again, this recalculation favors the government because the number of lines corrected is incomplete.

All three types of recalculations should yield a total $639,136.00 in uncompensated TMS services for a reduction in fraud loss/restitution of like amount:

    Type 1    =    $173,585.00

    Type 2 =    98,681.00

    Type 3 =    366,870.00

    Total  =    $639,136.00

The loss amount should credit that Dr. Kinrys paid Neuronetics over $465,000.00 to use its machines on carriers' beneficiaries (Dr. Kinrys' patients). Defendant's office assistant, Ania Zawadzka, purchased 100 sessions at a time using Dr. Kinrys' credit card. "We always purchased more before we ran out." See, Tr. 4/95 - 96. Records indicate that defendant paid $80 to $90 per TMS session for each "token". Neuronetics payment summary, Ex.B. The summary shows that Dr. Kinrys paid Neuronetics a total of $627,352.00. *Id.* Deducting the cost of the Neurostar machines and supplies, $465,628.00 of that sum was to obtain "tokens", the device manufacturer's permission to operate the system.

# POINT II:
# SUBSTANTIAL REDUCTION WARRANTED
# IN GOVERNMENT'S FACE-TO-FACE SESSIONS CLAIM

The government claims an actual loss of $2,057,242.02 for billing in excess of 12 sessions per day for services of "Evaluation and Management" and "Psychotherapy" under CPT codes 99204/90836 or 99214/90836. See, 752-line chart entitled "Days In Which Kinrys Billing Reflects More Than 12 Patients Billed With 99204/90836 or 99214/90836", Ex. A to government's motion for restitution, Doc. 247-1. The government claims that the principal and add-on billing codes defendant used mandated his spending 70 minutes with each patient. This argument implies that a doctor spending less time than the codes suggest is fraudulent. Assuming Dr. Kinrys could not spend in excess of 12 hours a day in face-to-face meetings with patients, the government maintains that every bill on the same date in excess of that amount is fraudulent. Defendant disagrees.

The government claims that it was impossible for Dr. Kinrys to have legitimately billed under these codes for more than 12 patients in a day. The trial evidence does not support that assumption. The government showed at trial, to meet a different standard of proof, that billing for more than 24 sessions a day was evidence of fraud, what the government called "impossible days". At trial Agent Horan testified about the government's exhibit chart of days with more than 24 patients, determining a total fraud of " approximately $900,000" (less than half of what is currently claimed) based on an average reimbursement rate multiplied by sessions in excess of 24. Tr. 6/108-111, Ex. 239.18. (The exhibit totals charges to carriers under CPT codes 99204/90836 or 99214/90836).

The evidence shows that Dr. Kinrys worked long hours usually *scheduling* 18 patients on office visit days, according to his calendar. For example, the Wednesday, January 11, 2017

entries in the Natick calendar show 18 non-cancelled patient meetings for Dr. Kinrys and seven TMS sessions for Ms. Zawadzka to conduct. Ex. 83. Zawadzka's testimony confirms that defendant met his patients for evaluation/maintenance and psychotherapy sessions in his 67 Union Street, Natick office mostly on Wednesdays and at MGH on other days. For example, Dr. Kinrys' calendar (Ex. 83) for his Natick office for May 31, 2015 to December 31, 2018 typically shows appointments for 18 patients scheduled from about 9:00AM until after 9:30PM. Ex. *Id*. As office assistant Ania Zawadzka noted, "I know that when Dr. Kinrys was in the office, he was very busy. He had a full schedule." Tr. 4/109. There was no testimony from Ms. Zawadzka to indicate that the calendar entries were false. In fact, she testified that the calendar was "very accurate" and that she would update it by noting cancellations and whenever a patient did not come in.

> Q. . . [W]ould this [the calendar entries] be an accurate representation of what patients are coming into the office?
>
> A. Yes, very accurate.

Tr. 4/113. Furthermore, Ania Zawadzka testified that Dr. Kinrys saw patients at MGH on other days. "It was my understanding he was working at the hospital, seeing patients there. . . . Mass. General." Tr. 4/82.

The government maintains that this schedule of 18 patients on office visit days meant that Dr. Kinrys was violating the suggested time range for the CPT codes by not spending the full time suggested in the codes. To make this proof, the government offered the testimony of James Bavoso, the "manager of provider outreach and education" at a Medicare administrative contractor called NGS or National Government Services. Tr. 2/147. Defendant had objected to Mr. Bavoso's testimony on the grounds that it was improperly disclosed expert testimony and that Mr. Bavoso would be testifying in an expert capacity. See, Tr. 2/5-12. The Court allowed

8

Mr. Bavoso to testify freely on the specialized subject of CPT codes. With that, the government adduced evidence from Mr. Bavoso in an attempt to show that billing for patient sessions that were shorter than the codes provided was fraudulent. Examining Mr. Bavoso's testimony carefully, however, shows he did not testify that spending less time than the codes suggested would be fraudulent or non-payable. He testified essentially that the minutes suggested were average times and that the validity of using the code would be judged on multiple factors like complexity or severity. The following extended exchange occurred during examination about the CPT codes in an exhibit entitled "2015 Professional Edition CPT" (Ex. 73):

> Q. Okay. Let me ask this, so what's required to bill each one of those, whether it's a 99211, all the way up to a 99215? Is that set forth here in the CPT codes?
>
> A. The description in the CPT talks a little bit about that. So it says, for instance, a 99214, that it requires at least two of these three components. You'll see the highlighted, those bulleted items, detailed history, detailed exam and moderate medical decision-making.
>
> Detailed history is just that, when you're *talking* to the -- when the physician and the patient are *talking*, they're taking a history of that patient. Why did they come in that day, you know, I have a pain in my shoulder. When did it start? So you'd do a history of that. And then it's past family and social history. So it talks about your past, the patient, your family's history and your social history, and that's all documented.
>
> And then the physical examination is the body parts, the anatomical sites that the physician is examining in that encounter.
>
> And then, finally, the counseling or the decision-making that the physician needs, and this is saying that it's moderate complexity. So there's a number of issues, a lot of data that is being reviewed in that encounter based on the history and physical exam.
>
> Q. Okay. So real quickly, if I'm looking at this and it says you have -- this is for an office visit with an established patient, that's someone who's been to the doctor before, that doctor?
>
> A. Yes.

> Q. So let me ask this. And then it says two of the three components have to be hit, and it's two of these three that are in bold?
>
> A. Yes.
>
> Q. I want to focus us right down here where it says -- can you read what that says?
>
> A. "Usually the presenting problem or problems are of moderate to high severity. Typically, 25 minutes are spent face to face with the patient and/or the family."
>
> Q. It says "Typically, 25 minutes are spent face to face."
> Is that a rigid requirement, like, do you have to get to 25 or can it be below?
>
> A. Twenty-five is an average. Some doctors are a little faster, some doctors are a little slower, also depending on the information. *But it's really what goes into the encounter between the doctor and the patient and what's documented about that.* [emphasis added]

Tr. 2/177-178. The government made another attempt at proving that spending less time with the patient than the codes allowed would non-payable or fraudulent:

> Q. Okay. And for psychiatrists to legitimately bill and properly bill for a psychotherapy visit under this code, 90836, what would a psychiatrist have to do? What's required?
>
> A. What's required for this?
>
> Q. Yes.
>
> A. *Again, I'm not a clinician,* so, yes, this would be psychotherapy or talk therapy with the patient and the doctor interacting over their mental status and the doctor is working with the patient on that.
>
> \* \* \* \*
>
> Q. OK. This says 45 minutes with the patient. Do you have to spend 45 minutes with the patient in order to have this?
>
> A. *Again, that's the average. Sometimes it's a little less, sometimes it's a little more, but that's the average that the AMA recommends.*

Tr. 2/180-181.

Mr. Harper also testified that add on codes were *not* required to be sequential or consecutive:

> Q. So it doesn't -- it's not just like you add the two of them up, it could take place even less than that, right, so that's where you get the 60 or 70?
>
> A. Right.

Tr. 2/182.

Mr. Harper did, however, support the government that a physician's bill would be non-payable on the "impossible days" theory, that billing more than 24 sessions a day was not payable (and impliedly fraudulent):

> Q. Under what circumstances could a psychiatrist legitimately bill 99214 and 90836 more than 24 times in a single day?
>
> A. That would be over 24 hours in a given day, so I don't think that would be doable.

Tr. 2/183.

Medical Center Hospitals and physicians would probably be surprised to learn that spending less time with their patients than the applicable CPT codes recommended is a crime.

Defendant seeks a restitution value that adjusts the amount paid for fraud by increasing the government's cut off number of 12 allowable face-to-face visits per day to 18 per day. Allowing 18 visits as non-fraudulent would more realistically credit Dr. Kinrys' for the treatment he gave the carriers' beneficiaries, his patients. There is little question that defendant spent many whole days seeing his patients in Natick and at MGH. Even if Dr. Kinrys spent only 39 minutes in an add on code visit 90836, the evidence did not show that charging both codes for a session was fraudulent.

The simple total from the values of amounts paid in the lines where total number of visits was 18 or less is $125,827.99 and should be deducted from the $2,057,242.02 claimed in Doc.

11

247-1 to $1,931,407.00. But this does not account for the majority of the money that should be deducted from that total. All the lines in excess of 18 have sums that could also be credited against the government's total. (Recalculation for 18 sessions per day might be easy for the government because it already has an Excel spreadsheet shell and data in electronic form.)

Defendant estimates a further reduction of the total government claim by a further 18% from $1,931,407.00 to $1,583,753.00. Defendant arrives at this 18% reduction by using an estimate based on page 18 of the government's chart at Doc. 247-1 (Ex. A to the motion). This page contains no lines with a value of 18 or less patients per day. It also appears to show a low if not the lowest average value paid per session because the dates of service all fall after November 14, 2017, about a month after the carriers had stopped paying Dr. Kinrys. Defendant uses the following method:

> All amounts paid listed under excess over 12 patients column were the divided by the number of patients less 12 as shown in column 1 ex 53 patients less 12= 41 patients. This number of patients was then divided into the amount paid in the patients over 12 column. This gives an average amount of payout per person. These individual amounts were then multiplied by 6 representing the additional patients we want included. All these amounts were totaled equaling $11,651, that reduces the obligation of the defendant.
> Then all amounts listed in the amount paid column in over 12 patients was totaled equaling $657,731. This amount was the divided into the $11,651 resulting in 18%. In effect including another 6 patients in our computation should produce an 18% lowering of the government calculation of amount taken by the defendant.

While this is a rough estimation, a better one is not available to defendant because the average values per session vary by hundreds of dollars where carriers began to pay less in 2017 and 2018. As the government has noted, "[t]he First Circuit has consistently held that the Government's restitution calculation need not be precise, so long as it is not speculative or unreasonable. *See, e.g., United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) ("[A]bsolute precision is not required.")." Doc. 247, pp. 2 - 3. The alternatives are not reasonable in the premises, either

creating a new spread sheet by manually inputting the data from the spreadsheet into an Excel spreadsheet that approximates the government's or by doing several calculations for each of the 753 lines to arrive at a revised total. Either would take many hours that exceed the resources of the defense. By contrast, the government could probably revise the operation of its spreadsheet to calculate for 18 allowable sessions for a more accurate number.

POINT III:
LEGAL BILLS MOSTLY NOT COMPENSABLE

Restitution for the legal bills shown in the exhibits to the government's motion should be denied. See, Docs. 247-2 - 247-4. (For costs allowable as restitution in cases like this one, see, §3663A(b)(4).[4])

Exhibit B (Doc. 247-2) to the government's motion, the first set of legal bills, contains a statement from Holland & Knight at $795.00 per hour for items like "mock cross examination" on September 22, 2023 of government witness Angela Arena, a 0.9 hour conversation with AUSA Callahan on September 7, 2023 "regarding Kinrys federal prosecution", a 1.9 hour "further conversation with AUSA Patrick Callahan regarding Kinrys indictment, defense theories, and preparation for trial of Angela Arena", calls with BCBS "team" about subpoena responses (subpoena to whom?) for 1.2 and 0.7 hours. It appears that none of the Holland & Knight bill is compensable. Restitution of outside legal fees for preparation of the *government's*

---

[4] (4) in any case, reimburse the victim for lost income and *necessary* childcare, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. [emphasis added]

13

witness testimony a month before trial is out of touch with what the law of this Circuit allows.[5]
Preparing government witnesses for trial is the government's job. (The Court may have formed its own impression, but a preponderance of the evidence suggests that AUSA Callahan and AUSA Looney need no outside assistance in trying and preparing a case.) Moreover, the trial preparation is not the allowable "preparation for interviews by prosecutors". Applicable First Circuit cases specifically exclude such items from restitution. See, *In re Akebia Therapeutics, Inc.*, 981 F.3d 32 (1st Cir. 2020). See, also *Lagos v. United States*, ⎯⎯ U.S. ⎯⎯, 138 S. Ct. 1684 (2018) (§3663A(b)(4) limiting restitution to investigations by the government in criminal proceedings). In *Akebia*, the First Circuit upheld the trial court's allowance and denial of certain legal expenses. The Court of Appeals cited with approval the district court's analysis of what was allowable under the MVRA and what was not:

> • "[C]osts of compiling and producing documents in response to government requests for those documents in connection with the criminal investigation";
> • "[C]osts incurred in connection with Akebia employees' preparation for interviews prosecutors"; by the government
> • "[C]osts incurred by Akebia as part of the restitution proceedings."

Preparation for cross examination by defense counsel less than a month before trial hardly qualifies as "Preparation for interviews by prosecutors". The billable rate of $795.00 per hour is also objectionable in a criminal case. Furthermore, such services were not "necessary" within the meaning of the MVRA. A legal bill for the carrier responding itself to a subpoena would be allowable.

---

[5] Counsel does not find this legal bill or others for trial preparation by corporate counsel. This material may have been disclosed, simply counsel cannot find it through computer file search or the discovery index. Corporate counsel is not the witness's attorney. The defense should have been able to explore the issue of outside counsel and what preparation and instructions corporate counsel may have given.

The second legal bill, Exhibit C to the motion (Doc. 247-3), is a letter from Blue Cross Blue Shield counsel requesting restitution of $1,995.56 for services of counsel in connection with witness Angela Arena, the same witness as the Holland & Knight bill. Doc. 247-3. The exhibit does not attach the February 29, 2024 document giving details of the legal services provided. There should be no restitution for the compensation of a salaried corporate officer because it is not a "cost"; the corporate officer would be paid in any case. That notwithstanding, why would the services of a third attorney or group of attorneys (government, Holland & Knight and BCBS) be necessary for the presentation of a single witness? Three separate counsel supporting one routine corporate witness is not a necessity.

Finally, Exhibit D to the motion (Doc. 247-4) claims restitution for $42,202.10 in legal fees for law firm Troutman-Pepper in connection with a Beacon/Anthem employee (presumably witness Sandra Nadler) for doing the same things for which the BCBS attorneys charged a third of that amount. The bill is excessive and it is also not for "necessary" services.

There would be no purpose in summarizing this 32-page bill (Doc. 247-4), but at least for an introduction to why the bill is objectionable, defendant begs the Court to turn its attention to the items at Doc. 247-4, p. 6. Did Beacon Anthem need 2.6 hours of attorney time to talk to AUSA's on October 3, 2024 for "analyzing indictment and *prepare for* meeting" with the witness? Doc. 247-4, p. 6. Did the carrier need to have counsel for 1.8 hours spent "in anticipation of upcoming meeting with AUSA Callahan"? *Id.* Did a second attorney need to attend a call of another attorney from the firm with AUSA Callahan for 1.1 hours on October 5, 2023 (two lawyers on one call)?

The Court should probably reject the whole Troutman-Pepper bill. Just because the carrier did not reign in its attorneys' bills does not justify awarding restitution of unnecessary

costs. Even the idea that Beacon/Anthem would need its own attorneys for witness meetings with the government is not entirely logical. Certainly, the government lawyers do not need help. What corporate interest could be compromised by a meeting between the government and the witness?

## CONCLUSION

For the reasons set forth above, the motion should be denied in part. The restitution claim for fraudulent TMS services should be reduced to $2,778,811.00. The claim for fraudulent face-to-face therapy sessions should be reduced to $1,583,753.00. The attorney fees should be denied as unnecessary. The government's claim to restitution should be limited to actual losses of $4,362,564.00.

Dated: May 30, 2024

Respectfully submitted,
GUSTAVO KINRYS, Defendant,
By his attorney,
s/Kevin L. Barron
Kevin L. Barron, Esq.
P.O. Box 290533
Charlestown, MA 02129

## CERTIFICATE OF SERVICE

Counsel certifies that he has caused a true copy of this document to be served today on the attorneys for all the parties through the CM/ECF system of this District as set forth in the notice of electronic filing and that no party requires service by other means.

/s/Kevin L. Barron