# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | **PUBLIC VERSION - REDACTED** |
| v. | ) ) | Criminal No.  1:20-cr-10307-DJC |
| GUSTAVO KINRYS, | ) ) ) |  |
| Defendant | ) ) ) |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

Over four years, Defendant Gustavo Kinrys engaged in a brazen, greed-fueled scheme to bill Medicare and private insurers for over $19 million worth of mental health treatments that he never provided.  To do this, Kinrys took advantage of the trust-based insurance system and the people within it:  his vulnerable and mentally ill patients, his trusting employees, Medicare and private insurers who unknowingly paid him millions based on his lies, and his lawyers who unknowingly passed on phony medical records on his behalf.

Kinrys' crimes were not the result of a one-time lapse in judgment.  They were not the product of a desperate individual in dire financial straits trying to provide for his family, or someone caught in the throes of addiction.  Unlike many defendants who come to this courthouse to be sentenced, Kinrys had options.  He was a highly educated doctor who had trained at elite academic institutions.  He held positions at Mass General Hospital and Harvard Medical School.  In addition to that, he had a successful private psychiatric practice.  At the time he embarked on his audacious scheme, Kinrys had just moved into a $1.8 million home in an upscale, Wellesley neighborhood.  He and his family were secure.  But he wanted more.  With the proceeds of his fraud, Kinrys purchased a $2.1 million vacation home on

Nantucket and spent over $600,000 on jewelry from Cartier, Truefacet, and Vean Cleef & Arpels.  Ex. A (detailed listing of Kinrys' jewelry purchases).  The motivation for Kinrys' was simple – greed.

When Kinrys was finally forced to answer for his conduct, a jury found him guilty of seven counts of wire fraud, six counts of false statements relating to health care matters, and one count of obstruction.  At that point, rather than accepting any responsibility or demonstrating any remorse, Kinrys doubled down.  He blamed everyone else.  He belittled and threatened his own lawyer.  He declared that his prosecutors would one day face "a reckoning" and that "Karma was a bitch."  He continued to pursue frivolous lawsuits he had filed against his victims – the insurance companies – in the month before his October 2023 trial, alleging that these defrauded insurers actually owed ***him*** money.  Kinrys continues to deny what a jury has concluded beyond a reasonable doubt:  he lied over and over again to get millions of dollars he wasn't entitled to, and he obstructed justice repeatedly in an attempt to keep those millions.

To punish Kinrys for these serious offenses, to promote respect for the law, to deter other doctors from taking advantage of vulnerable patients and trusting payors, and to avoid unwarranted sentencing disparities, the Government asks that this Court impose a significant, but below-guidelines sentence of 135 months in prison, followed by three years of supervised release, restitution in the amount of $5,662,515.50, and forfeiture of Kinrys' assets as set forth in the Government's Motion for an Order of Forfeiture.  Dkt. 246 (restitution); Dkt. 248 (forfeiture).

## I.    SUMMARY OF EVIDENCE

The Government presented overwhelming evidence at trial that Kinrys billed insurers over $19 million – and received more than $5.5 million – for TMS treatments and face-to-face psychotherapy sessions he never provided.  Among his fraudulent billing, Kinrys charged insurers for:

- over 20,000 TMS treatments his patients never received, including thousands of sessions supposedly provided to 74 patients who had not received a *single* TMS treatment;

- 382 days where he claimed to have provided 24 hours or more of face-to-face psychotherapy services; and

- thousands of face-to-face E/M and psychotherapy sessions supposedly taking place on dates when Kinrys was out of the country, or his patients were out of the country or in a different state.

### A.   *Kinrys billed for over 20,000 TMS Sessions He Never Provided.*

Representatives from Medicare and five private insurance companies testified at trial. Each explained the process for submitting claims to insurance companies, about the CPT codes used to identify the medical treatments provided to a patient, and about the insurance companies' expectation about the accuracy of the information contained in the claims. Each of these insurance witnesses also walked the jury through their insurance claims data, showing the number of claims that Kinrys submitted for TMS treatment (billed under CPT Codes 90867 through 90869) and face-to-face evaluation and management (E/M) and psychotherapy treatment (billed under CPT Codes 99214 and 90834 or 90836). See Trial Exs. 65-72.[1] Among other things, that data showed that Kinrys *billed* insurance companies for 26,293 TMS treatment sessions. See id. and Trial Ex. 239.01.

On the other hand, the jury heard from several sources about the many fewer medical treatments Kinrys *actually* provided to patients. Specifically, eight of Kinrys' patients (or family members of patients) testified at trial. They spoke about treatments they had received from Kinrys—and about treatments that they had *not* received. With respect to TMS, many testified that they had never received the treatment. See, e.g., Trial Transcript Day 1, Page 6⬛ Testimony: "Q. Did you ever receive a treatment from Dr. Kinrys called transcranial magnetic stimulation? A. No, I did not.");[2] Trial Tr. 2:26-

---

[1] Numbered exhibits (hereinafter "Trial Ex. []") refer to exhibits admitted into evidence at trial.

[2] References to the trial transcript are identified herein as "Trial Tr. [Day]:[Page]."

27 (███ Testimony: "Q. Do you know if you ever got 76 sessions of TMS? A. No, I did not. Q. Are you certain of that? A. Yes. … Q. Ever get it five days in a row? A. No. … Q. Did you ever receive 33 psychotherapy sessions from Dr. Kinrys? A. No. Q. Are you sure? A. I am."); ███ 9:22-24 ("Q. Did you ever actually receive TMS or transcranial magnetic stimulation? A. No."); Trial Tr. 2:224 (███ Testimony: "Q. Did you receive 147 TMS sessions … at Dr. Kinrys' office? … A. Absolutely not, no. Q. Did you receive a single TMS session. A. Not one.").[3]

Two long-time employees of Kinrys', Ana Zawadzka and Zaneta Carvahlo, corroborated these patient accounts, testifying, for example, that Patient ███ and Kinrys' wife, Irena Cafasso, either never received TMS treatment from Kinrys or did not receive the number of treatments that Kinrys billed for. See, e.g., Trial Tr. 4:183 (Zawadzka testimony: "Q. Did [Irena Cafasso] receive 460 TMS sessions at Dr. Kinrys' office? A. That's impossible. Q. Did she receive one? A. Maybe when I wasn't there at some point."); Trial Tr. 5:66-67 (Carvalho testimony: "Q. Did [Kinrys' wife] ever receive TMS therapy at the Natick office? A. Never … Q. All right. Do you know a patient named ███? A. Yes. Q. Did he ever receive TMS? A. No.").

Finally, Greg Harper, a former vice president of global research and development at Neuronetics, testified about the operation of the NeuroStar System. He made clear that the NeuroStar maintains a record of *every* TMS session provided by either of Kinrys' two NeuroStar systems and that the data includes the date of the TMS sessions and the name of the patient who received it. Importantly, he explained that the number of TMS treatments provided to patients was *limited* by the number of sessions Kinrys purchased from Neuronetics. See Trial Tr. 2:80-87. Critically, Harper introduced data showing (i) that Kinrys provided a total of 5,587 TMS treatment sessions to patients, Trial Exs. 6, 6.1; (ii) the

---

[3] ███ testimony was introduced through his videorecorded Rule 15 deposition, which is cited herein as "███ [page]:[line]".

date and name of the patient receiving those treatments, id.; and (iii) that Kinrys purchased a total of

5,794 TMS treatment sessions from Neuronetics, Trial Ex. 5. In other words, the maximum number of

TMS treatments Kinrys could possibly have provided at his office was a mere *fraction* of the number of

sessions Kinrys actually billed:

| Sessions Kinrys Billed | Sessions Kinrys Provided |
|---|---|
| 26,294 | 5,587 |

Put simply, Kinrys billed for 20,707 TMS sessions that were never provided.

### B.    Kinrys Billed for Face-to-Face Therapy Sessions That Never Happened.

The evidence at trial showed that Kinrys repeatedly billed for face-to-face E/M and

psychotherapy sessions that never happened.

Six of Kinrys' patients testified that he billed their insurers for face-to-face psychotherapy

session that they never received. ▮▮▮▮▮▮ testified that he received fewer than five psychotherapy

sessions, yet Kinrys billed him for almost 40 sessions, including dozens of sessions when he was

attending college outside Massachusetts. Trial Tr. 4:22. ▮▮▮▮▮▮ who saw Kinrys for TMS only,

was billed for 25 face-to-face psychotherapy session that never happened. ▮▮▮▮▮▮,

testified that she never received psychotherapy from Kinrys, yet her insurer was billed for 63 sessions

over two and half years. ▮▮▮▮▮ and ▮▮▮▮▮▮ testified similarly that they had not

received psychotherapy sessions that Kinrys billed for—and both testified that the fabricated patient

progress notes supposedly documenting those sessions were patently untrue. The evidence at trial

showed that Kinrys did not limit his false billing to his own patients. Kinrys not only billed for dozens

of psychotherapy sessions for patient ▮▮▮ but he also billed ▮▮▮ mother, ▮▮▮▮▮.—who was

never even Kinrys' patient—for 24 psychotherapy sessions.

**C.**    ***Kinrys Billed for Face-to-Face Psychotherapy and E/M Services When He Was Not in the United States.***

Border crossing records, witness testimony, and Kinrys' own emails and calendar conclusively showed that he billed for over $500,000 worth of face-to-face E/M and psychotherapy sessions he claimed to provide – even on days when he was outside the United States:

| E/M And Psychotherapy Patient Visits Billed While Kinrys Is Out Of The United States | | | |
|---|---|---|---|
| Date[1] | # Patient Visits Billed[2] | Amount Billed[2] | Amount Paid[2] |
| July 11, 2015-July 23, 2015 | 162 | $56,000.00 | $31,298.12 |
| July 24, 2016-July 29, 2016 | 90 | 40,500.00 | 18,851.82 |
| February 19, 2017-February 25, 2017 | 176 | 108,880.00 | 30,498.67 |
| July 8, 2017-July 24, 2017 | 499 | 303,730.00 | 93,887.46 |
| **Total** | **927** | **$509,110.00** | **$174,536.07** |

<u>See</u> Trial Ex. 239.14.  For example, Kinrys claimed he provided over 499 sessions of E/M and psychotherapy sessions while he was on vacation in Prague during a two-week period in July 2017.  <u>Id.</u>; PSR ¶¶ 66-67; Trial Ex. 83 (Kinrys calendar showing "No patients – Away" for July 11-July 24, 2017); Trial Ex. 262.  To cover up this part of his fraud, Kinrys also lied to his biller, Yelena Barin, claiming that he was not taking any vacation that summer other than "weekends here and there … no rest for the wicked!" Trial Ex. 47; PSR ¶¶ 68-70.

**D.**    ***Kinrys Billed for Face-to-Face Psychotherapy and E/M Services When His Patients Were Not in the United States.***

Witness testimony, witness travel records, and border crossing records proved that Kinrys billed for face-to-face psychotherapy sessions (CPT codes 99214 / 90836) he falsely claimed to provide to patients who were not even in the United States.  For example, both ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ ▮▮▮▮ testified that, on days when Kinrys told insurers that he was providing them psychotherapy, they were over 3,000 miles away in Brazil and had received no treatment.  <u>See</u> PSR ¶ 62; Trial Tr.4:17-27 (▮▮▮▮▮); Trial Tr. 3:162-170, 3:182-208 (▮▮▮▮▮); Trial Exs.  239.16; 239.17.

### E.   *Kinrys Billed for Impossible Amounts of Face-to-Face Psychotherapy Sessions.*

On over 380 days, Kinrys fraudulently billed for an impossible number of hour-long, E/M and psychotherapy sessions—more than 24.  See Trial Ex. 239.18.  Kinrys' personal record for face-to-face psychotherapy sessions was 79 on August 18, 2017—a Friday when he was not even in the office and his calendar showed only two scheduled patients.  Trial Ex. 83 at 840; Trial Ex. 239.18 at p. 7, line 244.  Kinrys billed for over 24 hours' worth of face-to-face psychotherapy on dates when he was in the Dominican Republic (July 25, 2016 – 26 sessions), the Bahamas (February 20, 2017 – 55 sessions), and Europe (July 17, 2017 – 66 sessions).  See PSR ¶ 66; Trial Ex. 239.18 at 2, 4, 7.

### F.   *Kinrys Obstructed Justice by Using His Employees to Create Fake Records and Then Producing Those Records to Private Insurers, CMS Investigators and in Response to an HHS-OIG Subpoena.*

In November 2017, when Medicare and private insurers, such as BCBS and Tufts, began sending Kinrys requests for patient medical records ("MRRs") to verify the inflated claims he was submitting, he undertook a course designed to obstruct the investigation—by lying to those insurers and directing his employees to create phony patient records.  See PSR ¶ 73-78; Trial Tr. 4:138-198 (Zawadzka Testimony); Trial Tr. 5:35-51 (Carvalho testimony).  Kinrys forced his employees to create hundreds of pages of fake patient records that documented appointments that never happened and—even more egregiously—falsely reflected that sick patients were getting better when, in fact, their condition was deteriorating.  See, e.g., Trial Tr. 4:156-158.  To further obstruct these inquiries, Kinrys referred insurers seeking records to a fictitious "office manager," Thomas Doyle, and described a non-existent "medical records department" to excuse his years-long delay in responding to records requests.  See PSR ¶¶ 73-78; Trial Ex. 233 ("[Y]our request was forwarded to our medical records department … In the future, please contact our office manager, Thomas Doyle…").

Kinrys' obstruction continued when Medicare investigators conducted an on-site visit at his Natick practice in March 2018 and requested records for five patients / Medicare beneficiaries.  The trial

evidence showed that Kinrys created records for three of those patients— ███████████ ,

and ███████ —and produced them to CMS investigators that very day.  See PSR ¶ 79; Trial Tr.

5:122-139; Trial Exs. 118, 120, 125.

> **G.** **Kinrys' Production of Fake Patient Records Through His Attorney in Response to the July 2018 HHS-OIG Subpoena.**

Kinrys' obstructive behavior continued later in 2018 when he received an HHS-OIG subpoena

seeking patient records relating to Medicare beneficiaries.  Between August and mid-October of that

year, Kinrys produced—through his lawyer—hundreds of pages of fake patient records purporting to

document TMS treatments that never happened and psychotherapy sessions that he never provided.  See

PSR ¶¶ 82-89.  For example, on October 15, 2018, Kinrys sent HHS 139 pages of patient progress notes

purporting to describe 32 psychotherapy sessions he had provided to patient ███████ .  See Trial

Ex. 115.5.  At the end of each note, Kinrys included the following statement above his signature:  "Time

spent face to face with patient and / or family and coordination of care:  52-67 minutes."  Contrary to

these notes, ██████ testified at trial that he had seen Kinrys fewer than 10 times in his life.  Trial Tr.

2:33-34.  Moreover, the evidence at trial showed that each of the ten TMS reports Kinrys produced in

response to the HHS-OIG subpoena contained dozens of made-up appointments.  See PSR ¶ 83; Trial

Exs.  239.22-239.31 (charts comparing actual TMS sessions for 10 patients with the false TMS reports

submitted by Kinrys to HHS-OIG).

## II.   GUIDELINES CALCULATION

> **A.** **The Loss Amount under U.S.S.G. 2B1.1(b)(1)(k) is Greater Than $9.5 million**

During his fraud scheme, Kinrys billed insurance companies more than $19 million and was paid

more than $5.5 million for TMS and face-to-face therapy sessions that he never provided and that never

took place.  *See* PSR ¶¶ 91-92.[4]  Based on these figures, Kinrys' total offense level should be increased by 20 levels because the loss from Kinrys' offense—approximately $19 million—is greater than $9.5 million, but less than $25 million.  U.S.S.G. § 2B1.1(b)(1)(K).  Kinrys raises several arguments for why loss should be a lower figure, but none holds water.

First, Kinrys contends that a recent Supreme Court decision interpreting a different statutory and regulatory regime (Kisor v. Wilkie, 139 S. Ct. 2400 (2019)) and an out-of-circuit decision (United States v. Banks, 55 F.4th 246 (3rd Cir. 2022)) require "loss" to be measured by the amount insurers paid (approximately $5.5 million).  Commentary to the Sentencing Guidelines, however, mandates that loss under U.S.S.G. § 2B1.1(b) be measured by the greater of actual or intended loss—with the latter defined by the Sentencing Guidelines Commentary to mean "the pecuniary harm that the defendant purposely sought to inflict, [including] intended pecuniary harm that would have been impossible or unlikely to occur."  U.S.S.G. § 2B1.1, cmt. 3(A).  Well-established First Circuit precedent holds that the application notes regarding loss calculation are "binding on the federal courts."  United States v. Bennett, 37 F.3d 687 (1st Cir. 1994).  This decision controls the outcome here and mandates the use of "intended loss" as the measure of loss under 2B1.1.(b)—consistent with the guidelines commentary.  See United States v. Brill, No. CR 20-10125-MLW, 2021 WL 4148215, at *2 (D. Mass. Sept. 13, 2021) (concluding that the court must follow First Circuit precedent concerning the meaning of "loss" under U.S.S.G. § 2B1.1).

Second, Kinrys claims that, if intended loss is used, that intended loss should be limited to the (unspecified) contractual insurance reimbursement rates.  See Defendant's PSR Objections ¶ 1B.  But this again flies in the face of First Circuit precedent holding that "in a case ... where a defendant's claims were demonstrably rife with fraud[,] ... a sentencing court may use the face value of the claims as a

---

[4] The calculation of these amounts is set forth in the Government's previously filed Motion for Restitution. Dkt. No. 246.  If needed, Bridget Horan, the FBI Forensic Accountant who calculated the loss amounts will be available to testify at the June 6, 2024 sentencing hearing.

starting point in computing loss." United States v. Ahmed, 51 F.4th 12, 25 (1st Cir. 2022). See also

United States v. Iwuala, 789 F.3d 1, 14 (1st Cir. 2015) ("In cases of health-care fraud, courts have

regularly held that the amount billed to Medicare is *prima facie* evidence of intended loss … the face

amount of a bill is presumptive evidence of the amount that the person who submits it expects to

obtain."). Kinrys submitted bills totaling more than $19 million dollars for services he did not

provide—*prima facie* evidence of the intended loss attributable to his scheme. And there is every reason

to believe he would have happily accepted exactly that much—even if that "intended pecuniary harm

would have been … unlikely to occur." U.S.S.G. § 2B1.1, cmt. 3(A). Indeed, the insurance claims and

payments data introduced at trial (Trial Exs. 65, 67-72) show that Kinrys did actually receive payments

of as much as 100% of the amount he fraudulently billed—sometimes upwards of $800 per TMS

session—for sessions that never happened. Moreover, strikingly, in the weeks leading up to his October

2023 trial, Kinrys filed civil lawsuits against BCBS, Optum, and UnitedHealth Group, Inc. claiming that

each owes him in excess of $15 million for reimbursement for medical care. Notably, he bases this

calculation on his *billings*, not on any contractually agreed-to reimbursement rate. See Kinrys v. Blue

Cross Blue Shield of Massachusetts, Inc., No. 2375-CV-00029 (Mass. Superior Ct.) Dkt. No. 1

(Complaint), ¶ 8 ("Defendant has systematically refused to reimburse Plaintiff for any of these claims,

which now total over Fifteen Million Dollars ($15 million) in *billed charges*.") (emphasis added);

Kinrys v. Optum, Inc. and UnitedHealth Group, Inc., No. 2375-CV-00035 (Mass. Superior Ct.) Dkt. No.

1 (Complaint), ¶ 10 (same).

   Finally, Kinrys claims that the fraud-loss amount should be offset because (i) he provided "TMS

treatments to some patients after causing fraudulent bills to be submitted but before the fraud was

discovered"; (ii) he provided "therapy sessions by video conference when he was outside the United

States or when his patient was outside the United States" and (iii) "The number of false bills cannot be

determined by subtracting the number of NeuroStar machine sessions purchase from the number of sessions billed [because] [t]he machine will run at times without purchasing additional sessions." On each point, however, the evidence is directly to the contrary. As to the first contention, far from providing offsetting services prior to his fraud being discovered, Kinrys continued his fraud scheme even after insurance companies sent him medical record requests as part of their investigation into his false billing scheme. See, e.g., Trial Ex. 175, 230. Despite receiving requests for records of treatments that had never happened, Kinrys persisted in his fraudulent scheme, obstructed the insurers' investigations, continued to demand payment for services he had not provided, and provided false records to support his demands for payment. See, e.g., Trial Exs. 181-186, 231-238. Indeed, up to the eve of trial, Kinrys continued to claim that insurers owed him tens of millions of dollars in unpaid claims. See Kinrys v. Blue Cross Blue Shield of Massachusetts, Inc., No. 2375-CV-00029; Kinrys v. Optum, Inc. and UnitedHealth Group, Inc., No. 2375-CV-00035. As to the second argument he raises, two patients testified about their trips overseas and both testified that they received no treatment— phone, video or otherwise—during the time when Kinrys was abroad. See Trial Tr. 3:162-170, 3:182-208 (███████████████████); 4:17-27 (███████████████████). Similarly, witnesses denied ever receiving treatment from Kinrys when he was abroad, and his calendars – which his employees testified were maintained punctiliously – had notations for the periods when he was overseas indicating "No Patients – Away." Trial Ex. 83 at 803-816 (noting "NO PATIENTS – AWAY" during Kinrys' 2-week trip to Prague between July 11, 2017 and July 24, 2017). As to Kinrys' third contention, an employee of the manufacturer of the NeuroStar system testified extensively about the system's operation, how it tracked every TMS treatment, and how the number of TMS sessions provided to patients was limited to the 5,594 TMS session credits purchased from Neuronetics. Trial Tr. 2:80-100. That trial testimony went unchallenged.

Kinrys sent fraudulent bills totaling more than $19 million for services he never provided. Far from making amends (as he claims), upon discovery of his offenses, he doubled down on his falsehoods and continued to claim he was owed millions.  He should be held accountable for all of the money he tried to steal from Medicare and his insurance company victims.

**B.      A 2-level Increase for a $1 million Loss to a Government Health Care Program is Appropriate**

Section 2B1.1(b)(7) of the Sentencing Guidelines provides for a two-level enhancement if "(A) the defendant was convicted of a federal health care offense involving a Government health care program; and (B) the loss under [U.S.S.G. § 2B1.1] (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels."

Here, the amount billed to Medicare exceeds $1,000,000, see PSR ¶ 92, and so this two-level enhancement should be applied.  Kinrys objects and contends that Medicare's loss should be measured only by the amount it *paid* for fraudulent claims—$872,632.00.  But, as described *supra* at § II.A, loss under U.S.S.G. § 2B1.1(b)(1) is measured as the greater of the intended or actual loss, and intended loss here is appropriately measured by the amount fraudulently billed to Medicare—more than $3 million.

**C.      The Abuse of Position of Trust or Special Skill Enhancement under U.S.S.G. § 3B1.3 is Applicable**

Because he was the owner of Advanced TMS, its only psychiatrist, and the individual single-handedly responsible for the (false) billing, Kinrys held a position of trust and abused that position under U.S.S.G. § 3B1.3.  Section 3B1.3 states that "[i]f the defendant abused a position of public or private trust, **_or_** used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."  U.S.S.G. § 3B1.3 (emphasis added).  Application Note 1 to that section defines a position of public or private trust as one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  It goes on to note that people holding those positions "ordinarily are subject to significantly less supervision than

12

employees whose responsibilities are primarily non-discretionary in nature." <u>Id.</u>  In defining "special skill," Application Note 4 to § 3B1.3 explains that a special skill is one "not possessed by members of the general public and usually requires substantial education, training or licensing."  That Note specifically identifies "doctors" as an example.

Courts, including the First Circuit, routinely apply the 2-level enhancement under § 3B1.3 to doctors like Kinrys who defraud health insurance companies, recognizing that they are in a unique position where both patients ***and*** insurance companies ultimately defer to their representations:

> [C]ertain health care providers … occupy a position of trust with respect to both public and private insurance companies if they exercise professional or managerial discretion in treating patients and in billing for those treatments, which discretion is given deference by the insurers and helps to facilitate [a] crime. … Our precedents make clear that the touchstone for a finding that the defendant occupies a position of trust is not necessarily the amount of supervision the person receives, although that is an important factor to consider, but rather the amount of discretion the person has in his or her position of employment.  Insurance companies must, for the most part, assume that health care providers are billing for services that they have actually performed. Because the methods available to insurance companies for assessing whether care providers have been honest ... are limited, billing fraud is hard to detect, and insurance companies must ultimately defer to the health care providers' representations that service was performed.

<u>United States v. Hodge</u>, 259 F.3d 549, 555–56 (6th Cir. 2001); <u>see</u> <u>United States v. Gill</u>, 99 F.3d 484, 489 (1st Cir. 1996) (applying § 3B1.3 and noting that "'[e]ffective psychotherapy … depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.' *The guideline phrase 'private trust' readily describes the relationship of a psychologist vis a vis his or her patients*") (internal citations omitted)); <u>United States v. Hoogenboom</u>, 209 F.3d 665, 671 (7th Cir. 2000) (psychologist who defrauded Medicare by submitting false documentation of patient services to billing clerk deserved upward adjustment because medical service providers "enjoy significant discretion and consequently a lack of supervision" in treating patients and Medicare must depend "on a presumption of honesty when dealing with

statements received from medical professionals"); <u>United States v. Sherman</u>, 160 F.3d 967, 970 (3d Cir. 1998) (similar); <u>United States v. Iloani</u>, 143 F.3d 921, 923 (5th Cir. 1998) (similar); <u>United States v. Rutgard</u>, 116 F.3d 1270, 1293 (9th Cir. 1997) (similar); <u>United States v. Adam</u>, 70 F.3d 776, 782 (4th Cir. 1995) (stating that "welfare fraud is terribly difficult to detect because physicians exercise enormous discretion"); <u>United States v. Ntshona</u>, 156 F.3d 318, 321 (2d Cir. 1998) ("We adopt the view of the other circuits presented with this issue and hold that a *doctor* convicted of using her position to commit Medicare fraud is involved in a fiduciary relationship with her patients and the government and hence is subject to an enhancement under § 3B1.3."); <u>United States v. Shinderman</u>, 474 F. Supp. 2d 180, 184–85 (D. Me. 2007), <u>aff'd</u>, 515 F.3d 5 (1st Cir. 2008) (applying § 3B1.3 and noting that "[d]octors are specifically included among those who have a 'special skill' and that are subject to "no supervision"); <u>United States v. Fata</u>, 650 F. App'x 260, 263 (6th Cir. 2016) ("That a doctor works with little supervision and exercises 'substantial discretionary judgment that is ordinarily given considerable deference' is axiomatic.").

The two-level enhancement under § 3B1.3 applies to Kinrys here because he used his position as the owner and primary psychiatrist at Advanced TMS—a position with no supervision whatsoever—to facilitate his crime and later conceal it.  In his role as the operator of Advanced TMS, Kinrys designed and implemented a billing system over which he had exclusive control.  He—and no one else—created the false billing sheets.  He—and no one else—sent those fake billing sheets to his biller at SGS Billing with instructions to use his fraudulent billing sheets to generate and submit bills to insurers.  He—and no one else—saw the reports from his biller showing the outsized checks and reimbursements pouring into his account.  PSR ¶ 39-41, 43(1-2), 50.  While Kinrys delegated virtually every task in his office to his employees—scheduling, cleaning, purchasing TMS tokens, even administering TMS treatments with no supervision—the one task Kinrys would **<u>not</u>** let anyone touch was his fraudulent billing process.  Kinrys

purposely kept his employees away from the billing process and, in doing so, ensured that no one with any insight into the reality of Kinrys' practice could see the wild discrepancies between (a) the small number of patients Kinrys actually saw and (b) the much higher number of patients Kinrys billed for.

Not only did Kinrys use his position of trust to facilitate his crime, but he also used it to conceal his crime. As the evidence at trial made clear, when insurance companies became suspicious of his conduct, Kinrys—as the one solely in control of billing and communications with the insurance companies—ensured he was the person interfacing with those insurers. He then repeatedly lied to them and obstructed their attempts to investigate the red flags they had uncovered by refusing to turn over patient records (that he didn't have) in response to insurers' requests. PSR ¶¶ 73-75. As the Court will recall, he was the only person who communicated with BCBS when BCBS sought patient records for its post-pay review and – using the fabricated identity of "Thomas Doyle" and a bogus email address – Kinrys pretended to be someone else and dodged years' worth of attempts by BCBS to get records to confirm one way or another whether Kinrys was submitting phony claims. PSR ¶ 74; Trial Ex. 236; Trial Tr. 4:79-81 (testimony concerning there being no one named Thomas Doyle at Kinrys' office).

Kinrys was able to prevent detection of his fraud for years, in part, because he had ***no supervision***, and no one watching over him and his interactions with insurers. Kinrys used his position of trust with Medicare in a similar way. On the day in March 2018 that he received a visit from Medicare auditors who were looking for sample records to support his high Medicare billings, Kinrys delayed coming into his office while he gathered three sets of false patient records to provide to the auditors that day. PSR ¶ 79. He relied on the fact that no one was supervising him and in fact used his employees to help him avoid detection. Trial Tr. 5:128-139 (testimony of CMS investigator Cheryl Barnes). In circumstances such as these, application of the two-level enhancement is proper. See U.S.S.G. § 3B1.3, Application Note 2 ("For this adjustment to apply, the position of … trust must have

15

contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."); United States v. Sicher, 576 F.3d 64, 71-72 (1st Cir. 2009) (applying § 3B1.3 enhancement in fraud case where defendant was able to carry out fraud on a charitable foundation for years because her trusted position allowed her to delete certain pages of bank records would have revealed the fraud to superiors).

### D. The Obstruction of Justice Enhancement under U.S.S.G. § 3C1.1 is Appropriate.

The Government agrees with Probation that § 3C1.1 applies given Kinrys' conviction on one count of Obstruction of a Criminal Investigation of a Health Care Offense, which charged Kinrys with directing the creation of numerous false patient records, which he then produced to HHS-OIG in response to a July 10, 2018 HHS-OIG subpoena seeking records in connection with its investigation into Kinrys' fraudulent claims. PSR ¶¶ 82-89, 123; Trial Ex. 239.22 – 239.31.

### E. The Vulnerable Victim Enhancement under U.S.S.G. § 3A1.1 is Appropriate.

Kinrys submitted fraudulent bills to insurance companies, defrauding them of millions of dollars. The insurers whom Kinrys defrauded of millions of dollars were not his only victims.  Kinrys' actions—including specifically denying his patients appropriate mental health care—harmed his vulnerable patients as well.  Accordingly, the Court should apply the "vulnerable victim" enhancement and increase Kinrys' offense level by two because he "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).

As an initial matter, Kinrys' patients are among the victims of his fraud for purposes of the vulnerable victim enhancement.  "The Guidelines … make clear that a 'victim' means 'a person ... who is a victim of the offense of conviction and *any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).*'" United States v. Cadden, 965 F. 3d 1, 35 (1st Cir. 2020) (emphasis added; citing U.S.S.G. § 3A1.1 cmt. n.2).  Thus, "a physician's patients can be victimized by a

fraudulent billing scheme directed at insurers or other health care providers." United States v. Sidhu, 130 F.3d 644, 655 (5th Cir. 1997). See also Cadden, 965 F.3d at 36 (holding that medical patients harmed by a fraud scheme could be victims under U.S.S.G. § 3A1.1. and that it was an "error of law" to conclude that the reach of the vulnerable victim enhancement was limited only to defrauded parties).

Here, Kinrys victimized his mental health patients—some of whom suffered debilitating depression or anxiety that prevented them from even leaving their homes—by providing them with sub-standard care as part of his fraud scheme. The NeuroStar System's instructions for use ("IFU") indicate that patients should receive TMS treatments at a frequency of five times per week for a six-week acute TMS treatment period followed by a tapering period—for a total of approximately 36 TMS treatment sessions. PSR ¶ 101. Numerous clinical studies, cited in the IFU, have shown the efficacy of this treatment plan for patients suffering from chronic depression. Id. Neuronetics employees who trained Kinrys and his employees on the NeuroStar likewise specifically highlighted the need to use the system for five sessions per week for six weeks. Trial Tr. 4:90. Despite this clearly described protocol, Kinrys regularly told patients that two or three TMS treatment sessions per week would provide the same therapeutic benefits. PSR ¶ 102. Trial Tr. 2:125-126 ("I had read differently; that in order to get the full effect, you needed to go five days a week for approximately four to six weeks…. [Kinrys] said I could go, it didn't matter the length or the number of days that I went…. Q: Did you trust that? A: Yes."). None of the studies cited in the NeuroStar IFU support Kinrys' claim that less frequent TMS sessions would provide the same therapeutic benefit. PSR ¶ 101. In addition, the majority of Kinrys' patients who received any TMS received fewer than the IFU-recommended 36 total treatment sessions. See Trial Ex. 239.1. By providing only a small fraction of the TMS sessions that he billed for, Kinrys saved upwards of $1.5 million. Even as he failed to provide appropriate therapeutic treatment to patients—that

is, failed to properly treat their severe chronic depression—Kinrys created reports falsely suggesting that their mental health was improving.  PSR ¶ 107; Trial Exhibits 101-118.

These patients were very clearly "vulnerable."  Seven patients (and the mother of an eighth) testified at trial.  Each described severe mental health issues—including anxiety and chronic depression.  More generally, Kinrys largely catered to patients with severe, chronic depression.  Such near-crippling mental health conditions plainly rendered Kinrys' patients vulnerable.  See Gill, 99 F.3d at 488 (1st Cir. 1996) (concluding that patients at a community health center as a class were "vulnerable victims" because "a sentencing judge could reasonably conclude based on general knowledge that, in the typical situation, at least a fair number of patients at a community mental health center are commonly under significant emotional stress"). The Sentencing Guidelines commentary provides a hypothetical example of when the vulnerable victim enhancement would apply: "[I]n a fraud case in which the defendant marketed an ineffective cancer cure."  U.S.S.G. § 3A1.1 cmt. n.2.  Much the same, patients came to Kinrys for help and, instead of providing the medically appropriate and recommended treatment, Kinrys provided substandard mental health care and treated them as fodder for his fraud scheme and a means to make illicit profits.  These mental health patients—who relied on Kinrys' knowledge and expertise—undoubtedly were unusually vulnerable.  See also United States v. Stella, 591 F.3d 23 (1st Cir. 2009) (upholding application of vulnerable victim enhancement to patients put at risk by Stella's dilution of medicine, who were vulnerable 'by reason of their illnesses and the need for medication.'"); United States v. Echevarria, 33 F.3d 175, 181 (2d Cir. 1994) ("[A]n enhancement for vulnerable victims is appropriate where the exploitation of patients is part of the scam."); United States v. Bachynsky, 949 F.2d 722, 735 (5th Cir. 1991) (upholding application of vulnerable victim enhancement where fraud targeted insurers and the government because "patients were victims both because they falsely believed that they were receiving effective medical attention, and because they were unwitting instrumentalities

18

of the fraud[;] while relying on Dr. Bachynsky's ineffective course of treatment, his patients may have been foregoing more effective, safer, and legitimate treatments elsewhere.").

### F. A Two-Level Increase for Organizer, Leader, or Manager under U.S.S.G. § 3B1.1 is Appropriate.

Section 3B1.1(c) of the Sentencing Guidelines provides for a two-level enhancement "[i]f the defendant was an organizer, leader, or manager" of criminal activity. As described above, after Kinrys' insurance company victims grew suspicious of his fraudulent billing practices, those companies submitted medical record requests to Kinrys. See Trial Exs. 175, 230. In response, after stringing the companies along, Kinrys directed his subordinate employees to create false medical records to cover-up his fraud. See Trial Tr. 4:138-198 (Zawadzka Testimony); Trial Tr. 5:35-51 (Carvalho testimony). Both made clear that Kinrys directed them to create the false patient records. See, e.g., Trial Tr. 4:161 (Zawadzka testimony: Q. Those reports, were those true? A. They were all fake."); Trial Tr. 5:50 (Carvalho testimony: Q. Were any of the notes that you created for those patients accurate? A. No."); Id. 5:43 ("Q. Why didn't you … produce accurate [patient] reports? A. Because I was instructed differently. Q. By whom? A. By Dr. Kinrys.").[5] Accordingly, the Government agrees with Probation that the two-level enhancement under § 3B1.1 should be applied. PSR ¶ 121.

---

[5] The Introductory Commentary to U.S.S.G. § 3B makes clear that "[t]he determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), which encompasses his criminal obstructive conduct."

### G.    Final Government Guidelines Calculation

In light of the discussion above, the Government submits that the Defendant's total offense level
under the United States Sentencing Guidelines is 37:

|  | Government Calculation | Probation Calculation |
|---|---|---|
| **Base Offense Level (§2B1.1(a)(1))** | 7 | 7 |
| -   Loss > $9.5MM < $25MM - §2B1.1(b)(1)(K) | +20 | +20 |
| -   Obstruction - §3C1.1 | +2 | +2 |
| -   Abuse Trust / Special Skill - §3B1.3 | +2 | +2 |
| -   Vulnerable Victim - §3A1.1 | +2 | -- |
| -   Organizer, Leader Manager - § 3B1.1 | +2 | +2 |
| -   Loss > $1MM to Govt health care program §2B1.1(b)(7) | +2 | +2 |
| **Adjusted Offense Level** | **37** | **35** |
| **Criminal History Category** **Guidelines** | I 37 - 210-262 months | I 35 – 168-210 months |

## III.    APPLICATION OF THE GUIDELINES AND SECTION 3553(a) FACTORS

Application of the factors outlined in 18 U.S.C. § 3553(a) supports the Government's below-
guidelines recommendation of 135 months in prison, followed by three years of supervised release,
restitution in the amount of $5,662,515.50, and forfeiture of Kinrys' assets as set forth in the
Government's Motion for Order of Forfeiture and for Preliminary Order of Forfeiture. See Dkt. 246
(restitution); Dkt. 248 (forfeiture).

### A.    The Nature, Circumstances, and Seriousness of Kinrys' Offenses Justify a Significant Sentence of Incarceration

Kinrys' fraud and obstruction was long-running, vast, and took advantage of a uniquely
vulnerable population:  patients suffering from serious – and sometimes debilitating – mental illness.

While the scale of Kinrys' fraud can be conveniently quantified by referring to the many millions he stole from Medicare and private insurers, the effect his crime had on his mentally ill patients does not lend itself to easy calculation. The harmful effect his conduct had on those who trusted him, however, cannot be overstated.

From a financial perspective, Kinrys' criminal scheme had significant impact on Medicare and the private insurers he defrauded. Kinrys billed insurers over $19 million for TMS treatments and face-to-face psychotherapy sessions he never provided. His criminal conduct netted him more than $5.6 million in ill-gotten gains. He charged for over 21,000 expensive TMS treatments that his patients never received. And he told insurers that on 382 days he had spent over 24 hours providing face-to-face psychotherapy to his patients, when doing so would have been impossible. Those "impossible days" included days when Kinrys was thousands of miles away from his patients in places like the Bahamas, the Dominican Republic, and Europe. Kinrys' criminal conduct cannot be explained away as an aberrational, momentary lapse in judgment.

As the evidence at trial made clear, overbilling on this scale required deliberate and repeated misrepresentations by Kinrys over the four-year period charged in the indictment. It required Kinrys to create and send weekly billing sheets littered with egregiously false statements month after month and year after year. It also required Kinrys to take extensive and calculated steps to obstruct investigations by CMS, private insurers, and the federal government. Kinrys lied to these insurance companies after they alerted him to the concerns they had with his billing practices, and he did so to cover his tracks. He created a fictitious identity and email address (Thomas Doyle) to avoid auditing and a post-pay review process by his largest financial victim, BCBS. And when it came time to respond to medical record requests and a subpoena from HHS, he created – and forced his employees to create – hundreds of pages of fake patient records to send to insurance companies and the government to keep their investigators at

bay.  To accomplish this, he submitted those fake records through his attorneys, who had no knowledge of their falsity.

There is an undeniable cost that goes along with the type of fraud Kinrys engaged in that everyone must bear.  "Healthcare fraud … imposes significant financial costs on the healthcare system. The added expense of false or exaggerated insurance claims results in higher premiums and out-of-pocket expenses for consumers and higher costs of doing business for employers." Laura A. Feldman, Determining the Proper Standard of Causation to Support A Conviction Under 18 U.S.C. section 1347 When Healthcare Fraud "Results in Death", 98 Iowa L. Rev. 2061, 2065 (2013).   Congress aptly summarized the effects of health care fraud over twenty-five years ago:

> Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.

H.R. Rep. 104-747 (1996) )(internal quotation and citations omitted).   Courts in this district have recognized the serious damage health care fraud inflicts on the "entire health care system, including Medicare, on which hundreds of thousands of [the country's] most needy citizens depend to be run honestly and efficiently." United States v. Salzberg, No. 22-cr-10122-NMG (D. Mass. May 9, 2024) (Sentencing Tr. at 18).  Kinrys exploited the vulnerabilities in the trust-based health insurance system for his own financial benefit.  By doing so, he contributed to a societal harm.  The Court's sentence should take that harm into account.

Unlike the financial damage discussed above, the harm Kinrys' fraud inflicted on his patients is harder to quantify, but nevertheless profound.  In many instances, patients came to Kinrys to receive TMS after other treatments like therapy and medication had failed.  Many were desperate and out of options.  According to the studies and protocols described in the NeuroStar Instructions for Use ("IFU"), TMS was a treatment that was supposed to be provided five days per week for six weeks.  Employees at

Neuronetics, including the one who trained Kinrys and his employees, were clear about the five-days per week, six-week protocol.  Indeed, none of the studies cited in the NeuroStar IFU described any benefit patients would receive from TMS when provided once or twice per week.

Patient ███████ was one of the eight patients who testified at trial.  She described going to Kinrys to try TMS as a last resort, after everything else she tried – including shock therapy – had failed.  As ██████ described it, she was losing hope.  Before going to see Kinrys, she had done her own research on TMS and learned that, consistent with the clinical studies cited in the NeuroStar literature, she needed to receive the TMS treatment "five days per week, approximately 20 minutes, for four to six weeks."  When █████ asked Kinrys how frequently she would have to get the treatment, however, Kinrys told her she "could have it two times a week, three times a week, five times a week, whatever [she] wanted … [a]nd it would be effective."  When █████ questioned that, Kinrys told her that "it didn't matter the length or the number of days that [she] went."  ██████ made the mistake of trusting Kinrys' response.  She received ten sessions over the course of 8 weeks in late 2017 and then stopped treatment. Trial Ex. 239.23.  Kinrys billed her insurer for 46 treatments.

██████ was not alone.  Even in the limited instances when Kinrys *actually* provided TMS treatment, the vast majority of his patients received an insufficient amount – only getting TMS once, twice or three times per week, despite Kinrys routinely billing as though his patients had received the treatment five days per week.  The reason for this was simple:  Legitimately providing TMS five days a week for six weeks would have interfered with Kinrys' scheme to steal millions from insurers, because to provide that level of treatment, Kinrys would have had to pay for a sufficient number of TMS treatment credits from Neuronetics.

Because Kinrys had to purchase a credit for every TMS treatment session he *actually* provided, his scheme generated higher fraudulent profits at the expense of his patients' wellbeing.  Kinrys'

23

patients received less frequent and fewer total treatments than what was recommended by the NeuroStar IFU, while Kinrys purchased and paid Neuronetics for many fewer TMS treatments than he would have if he followed the NeuroStar protocol.  To put a finer point on it, Kinrys billed insurers for **21,000** more TMS sessions than he purchased TMS credits for.  Had Kinrys purchased the credits necessary to perform those sessions, he would have had to pay Neuronetics over $1.5 million, which would have cut into his ill-gotten gains.

Kinrys exploited the trust his patients placed in him as their psychiatrist.  He took an oath to "do no harm," and then ignored that oath to enrich himself, to purchase hundreds of thousands of dollars' worth of expensive jewelry, to live in a nicer neighborhood, and to buy a luxury Nantucket vacation home.  Ex. A (detailing over $600,000 worth of jewelry purchases between 2016 and 2019 at Cartier, Truefacet, and Vean Cleef & Arpels). The Government submits that its recommended sentence of 135 months appropriately reflects the nature, circumstances, severity and consequences of Kinrys' conduct.

### B.     Kinrys' History and Characteristics Provide No Explanation or Justification for His Criminal Conduct

As an initial matter, the Government acknowledges that there is more to Kinrys than this long-running fraud scheme.  From the information included in the PSR, Kinrys is a son, a father, a brother, and a husband.  The Government has no reason to believe anything other than that he loves and cares his family and is concerned for what the future holds for them.  The PSR states that Kinrys has provided emotional, physical, and financial support for his aging parents, including paying $100,000 for ███

███████████████.  Kinrys' upbringing was not without its challenges.  He appears to have been raised in a community where violence was normalized, and he was the target of violence multiple times growing up.  PSR ¶ 136.

Kinrys was fortunate enough, however, to be raised by two parents and his maternal grandparents in a modest home within a gated community.  He received his medical degree in Brazil and

went on to receive his doctorate at the Mayo Clinic in 2001 after moving to, and studying in, the United States. It appears that Kinrys' background and training earned him director positions at Mass General Hospital and an appointment as an Associate Professor at Harvard Medical School.

While the Government has no reason to believe that Kinrys earned these degrees and professional positions through anything other than talent and hard work, those achievements do little to change the brazen, $19 million fraud scheme he engaged in at the expense of his patients. In some ways, those achievements make Kinrys' criminal conduct worse. Being a law-abiding member of society is not a part-time job. Unlike some defendants who come to this courthouse to face sentencing, Kinrys was not an individual without options or support. He did not have a deprived upbringing. He had a loving and supportive family. He knew better.

At the time he initiated his four-year scheme, he was not in dire financial straits. To the contrary, Kinrys held prestigious positions at elite institutions and was in the midst of a successful career. He had his own psychiatry practice and, right as he was about to embark on his criminal scheme in early 2015, he had moved into a $1.8 million home in Wellesley with ███████████. Kinrys' crime was not one borne of desperation. He was not in debt. He was not looking for ways to provide basic necessities to his wife and children. He did not have a gambling problem. He was not struggling with addiction or mental illness. He had plenty going for him. Instead of acting in the best interests of his patients, Kinrys acted in his own best (financial) interests. He was greedy and wanted more – pure and simple.

### C.    The Need for General Deterrence and the Need to Promote Respect for the Law Calls for a Significant Term of Incarceration

The Government acknowledges that specific deterrence of Kinrys is not a significant factor for sentencing; Kinrys almost certainly will never practice medicine or bill insurance companies again. But there is good reason to deter others like Kinrys who would consider exploiting the vulnerabilities of their

patients and the health insurance system for their own financial gain.  As courts have recognized, general deterrence is a primary objective of sentencing in health care fraud cases:  "[W]hen the government obtains a conviction in a health care kickback prosecution, one of the primary objectives of the sentence is to send a message to others who contemplate such schemes that their crime is a serious one that carries with it a correspondingly serious punishment."  United States v. Howard, 28 F.4th 180, 209 (11th Cir. 2022) (concluding that imposed sentence was unreasonable where sentencing court "wr[ote] off general deterrence as a sentencing factor" (internal quotations and citations omitted)).  General deterrence takes on particular importance and salience in white collar cases, in part because "fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity."  United States v. Kuhlman, 711 F.3d. 1321, 1329 (11th Cir. 2013); United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the  3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]"); United States v. Brown, 880 F.3d 399, 405 (7th Cir. 2018) (agreeing with the "widely accepted principle" that white collar crimes are "prime candidates for general deterrence").

As the evidence at trial made clear, demands for overpayments from private insurers and audits from government health care programs were not sufficient to deter Kinrys.  This prosecution and others like it demonstrate the need for a greater degree of deterrence.  Deterring fraud committed against billion-dollar government programs like Medicare, one of the largest victims in this case, remains a critical factor in sentencing Kinrys.  A significant term of incarceration will ensure that others who have the benefit of participating in the Medicare program receive the message loud and clear.  Howard, 28 F.4th at 186 ("Like bears to honey, white collar criminals are drawn to billion-dollar government programs.").

A significant term of incarceration is also necessary here to promote respect for the law and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).  White collar offenders often argue that, by the time they have been charged and tried, they have suffered enough.  They have experienced reputational harm or a drastic turn in finances, the argument goes, which are adequate substitutes for – or should be taken into account when determining – meaningful punishment for a white-collar defendant.  Statements attributed to Kinrys in the PSR sound some of those tones.  Kinrys explains, for example, that as a result of his indictment and conviction, he and his family are "financially strapped" and have been abandoned by friends and neighbors.  PSR ¶¶ 140, 144. The Government respectfully submits that these collateral consequences should play no role in the Court's crafting of an appropriate sentence.  United States v. Morgan, 635 F. App'x 423, 445–46 (10th Cir. 2015) ("We agree with the reasoning of the Sixth, Seventh, and Eleventh Circuits. By considering publicity, loss of law license, and deterioration of physical and financial health as punishment, the court impermissibly focused on the collateral consequences of [the Defendant's] prosecution and conviction."); United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); United States v. Stall, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.").

As the Court in Morgan recognized, taking into account these collateral consequences impermissibly favors white collar criminals like Kinrys, who violate their position of trust and misuse their license and specialized skill to line their own pockets.  As mentioned earlier, Kinrys had more options at his disposal than many defendants who are sentenced in this courthouse.  He was a member of the upper class.  He had a supportive family, a sterling education, prestigious jobs, and multiple homes

in upscale locations.  He had no reason to resort to fraud.  While Kinrys should not be sentenced more

harshly than others who have been convicted of fraud and obstruction, he also should not be the

recipient of a middle-class- or upper-class-discount:

> [N]o 'middleclass' sentencing discounts are authorized. Business criminals are
> not to be treated more leniently than members of the 'criminal class' just by
> virtue of being regularly employed or otherwise productively engaged in lawful
> economic activity.  It is natural for judges, drawn as they are from the middle or
> upper-middle class, to sympathize with criminal drawn from the same class.  But
> in this instance, we must fight our nature.  Criminals who have the education
> and training that enables people to make a decent living without resorting to
> crime or more rather than less culpable than their desperately poor and deprived
> brethren in crime.

United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir.1999).

**D.     _The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct_**

Finally, the Government's proposed sentence serves the purpose of avoiding unwarranted

sentencing disparities.  First, the Government's recommendation falls below the sentencing guidelines

range as calculated both by the Government and Probation.  As the drafters of the guidelines explain,

"Guideline sentences, in many instances, will approximate average pre-guidelines practice and

adherence to the guidelines will help to eliminate wide disparity."  U.S.S.G. Ch. 1, Pt. A § (4)(G).

Kinrys' conduct, which involved an intentional and blatant insurance fraud, falls within the heartland of

similar fraud-based economic offenses.  The Sentencing Guidelines accordingly demarcate the bounds

of an appropriate sentence.  JSIN data similarly supports the requested sentence.  Similarly situated

defendants—those with a total offense level of 37 and a Criminal History Category of I—receive

sentences with a mean and median term of imprisonment of 121 and 102 months, respectively.  As

discussed, _supra_, Kinrys personal history and characteristics provide little to no basis for particular

leniency—and so a sentence modestly above these averages is appropriate.

In short, available data suggest that the sentence proposed by the Government falls in an appropriate range and would not generate unwarranted disparities.

## IV.    CONCLUSION

In light of the sentencing factors above, the Government recommends that the Court impose a sentence of 135 months in prison, followed by three years of supervised release, restitution in the amount of $5,662,515.50, and forfeiture of Kinrys' assets as set forth in the Government's Motion for Order of Forfeiture and for Preliminary Order of Forfeiture. See Dkt. 246 (restitution); Dkt. 248 (forfeiture).  The Government submits that this sentence is sufficient, but not greater than necessary, to fulfill the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

Dated: May 31, 2023

*/s/ Patrick M. Callahan*
Patrick M. Callahan
Christopher R. Looney
Assistant United States Attorneys